UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHIRE CITY HERBALS, INC.,<br><br>                Plaintiff,<br><br>vs.<br><br>MARY BLUE d/b/a FARMACY HERBS, NICOLE TELKES d/b/a WILDFLOWER SCHOOL OF BOTANICAL MEDICINE and/or WILD SPIRIT HERBS, and KATHERYN LANGLIER d/b/a HERBAL REVOLUTION,<br><br>                Defendants. | 3:15cv-30069-KAR |

## MEMORANDUM OF DEFENDANTS IN SUPPORT OF SPECIAL MOTION TO DISMISS PURSUANT to G.L. c. 231, § 59H

Defendants Mary Blue d/b/a Farmacy Herbs ("Blue"), Nicole Telkes d/b/a Wildflower School of Botanical Medicine and/or Wild Spirit Herbs ("Telkes"), and Katheryn Langelier d/b/a Herbal Revolution ("Langelier") (collectively, "Defendants") submit this memorandum in support of their special motion to dismiss pursuant to Massachusetts G.L. c. 231, § 59H.

### INTRODUCTION

The Defendants in this case participated in, and in the case of Telkes and Blue helped organize, an effort to have the United States Patent and Trademark Office ("USPTO") cancel Plaintiff Shire City Herbals, LLC's ("Shire City") registration of the term "FIRE CIDER." This movement began when the herbalist community learned that Shire City had trademarked a term that had been used for years to refer to a particular type of herbal beverage. The herbalist community strenuously opposed Shire City's attempt to monopolize this term for commercial use, including Shire City repeatedly causing other fire cider products to be taken off the market.

As part of the movement opposing Shire City's registration and enforcement efforts, Defendants raised awareness of the dispute and helped organize and participate in a peaceful boycott of Shire City's products. Shire City's response was to disagree that "fire cider" was generic but invited individuals to file a petition to cancel the registration with the USPTO. Two of the Defendants took Shire City up on that offer and filed cancellation petitions. In return, Shire City sued them. Counts IV, VII, VIII, IX and X, seek to punish Defendants for engaging in their protected petitioning activity. Those claims must be dismissed.[1]

## THIS COURT CAN HEAR THE PRESENT MOTION

In *Godin v. Schencks*, 629 F.3d 79, 92 (1st Cir. 2010), the First Circuit addressed whether a special motion to dismiss brought under an anti-SLAPP (Strategic Litigation Against Public Participation) statute could be heard in a United States District Court. Prior to *Godin*, anti-SLAPP statutes were considered primarily procedural and, therefore, inapplicable in a United States District Court. *See, e.g.*, *S. Middlesex Opportunity Council, Inc. v. Town of Framingham*, No. CIVA 07-12018-DPW, 2008 WL 4595369, at *9 (D. Mass. Sept. 30, 2008) (Massachusetts' anti-SLAPP statute is procedural). Interpreting the Maine anti-SLAPP statute, the *Godin* court found that it had procedural *and* substantive aspects, 629 F.3d at 89, and thus could be applied in a proceeding before a federal court. *Id.* at 90-92. Although *Godin* interpreted the Maine anti-SLAPP statute, its reasoning has already been applied to its Massachusetts counterpart. *Bargantine v. Mechanics Co-op. Bank*, No. CIV.A. 13-11132-NMG, 2013 WL 6211845, at *3 (D. Mass. Nov. 26, 2013) (noting that the Maine anti-SLAPP statute is "in all respects identical"

---

[1] Motions to dismiss brought under G.L. c. 231, § 59H may be brought against fewer than all counts alleged in a Complaint. *See North American Expositions Co. v. Corcoran*, 898 N.E.2d 831, 865 (Mass. 2009) (dismissing some claims under G.L. c. 93A, § 11 despite the presence of other claims). The present motion pertains only to those counts in the Complaint targeting Defendants' petitioning activity, namely Counts IV, VII, VIII, IX and X. Defendants do not, in the present motion, seek dismissal of Counts I, II, III, V and VI, alleging various forms of trademark infringement.

2

to G.L. c. 231 § 59H and, thus, could be brought in federal court). This Court, therefore, may hear the present motion. *See id.*

## FACTUAL BACKGROUND

Fire cider is a liquid concoction taken by spoonful or consumed as a beverage. Declaration of Mary Hastings ("Hastings Decl.") ¶ 3; Declaration of Nicole Telkes ("Telkes Decl.") ¶ 3.[2] It is made by steeping a variety of herbs, spices, citrus products, pepper or other "hot" flavorings (thus, the "fire"), and often a sweetening agent such as honey, in an apple cider vinegar base (thus, the "cider"). Hastings Decl. ¶ 3; Telkes Decl. ¶ 3. The term "fire cider" has been used for many decades by people who make, consume and sell fire cider. Hastings Decl. ¶ 4; Telkes Decl. ¶ 4. One of the first people to coin the phrase was Vermont herbalist and author Rosemary Gladstar. Hastings Decl. ¶ 4; Telkes Decl. ¶ 4. The term "fire cider" is used to refer to a particular type of beverage. An October 4, 2010 article provides an example of this use, stating that:

> Fall is upon us again, and with it comes the cold and flu season. One of the simple medicines that support your immune system and can be made at home is a remedy that herbalists call Fire Cider. It's very easy to make, tastes delicious and offers multiple health benefits.
>
> Fire Cider is an immune-boosting tonic with antibacterial, antiviral, antimicrobial and antifungal properties. It can be taken daily as a preventive and also at the onset of colds or flu. It's an expectorant. It breaks up congestion and helps us ward off respiratory ailments and sinusitis. It also helps to stimulate sweating and moves toxins out of the body, which is beneficial in cases of colds, flu and mild fevers.

Hastings Decl. ¶ 18, Ex. 14.

On April 20, 2012, Shire City filed an application with the USPTO to register the term "fire cider" as a trademark for a "dietary supplement drink." Dkt. 1 at ¶ 14. The registration for the "fire cider" mark issued on December 18, 2012. *Id.*

---

[2] Blue's legal name is Mary Hastings. Hasting Decl. ¶ 2. She is commonly referred to as "Mary Blue." *Id.*

3

*Initial Reaction to Shire City's Registration*

Early in 2014, news of Shire City's registration of the term "fire cider" spread on a blog post hosted by Common Wealth Herbs. Hastings Decl. ¶ 5; Telkes Decl. ¶ 5. Over the next several days, Ms. Gladstar, Defendants Blue and Telkes, and other herbalists communicated with one another and with Shire City about their concern over the registration. Hastings Decl. ¶ 6, Ex. 2; Telkes Decl. ¶¶ 5-8; Declaration of Katheryn Langelier ("Langelier Decl.") ¶ 4. On January 26, 2014, Blue created a petition at the website "change.org" designed to gather signatures of people who supported the USPTO cancelling Shire City's "fire cider" mark or, alternatively, wanted to convince Shire City to voluntarily cancel the Registration. Hastings Decl. ¶ 7, Ex. 3. The petition had 2,000 signatures within 24 hours. *Id.* ¶ 7.

On January 27, 2014, Telkes sent an e-mail to the principals of Shire City informing them of the long-standing use of the term "fire cider" and opposing Shire City's claim of trademark rights over the term. Telkes Decl. ¶ 7, Ex. 1. Shire City publically responded to the outcry, stating that:

> We 100% hear your concerns! You want 'fire cider' available to everyone always and we agree with you! We trademarked the phrase with the intention of protecting our business from bigger players in the natural foods industry, not to persecute folks making home remedies and selling their remedies on a small scale. We sincerely apologize for the confusion and fear this has created. Currently, 'fire cider' is not a generic term as recognized by the USPTO. Fire Cider was not protected in any way before we registered it. That is why our application was accepted and our trademark granted.
>
> So, what can we do?  How can we safeguard the traditional use of the phrase fire cider, while at the same time protecting our business we have worked to build? We need to consult with some professionals to figure out our options. We are all going to need to work together to make something positive happen. Please give us two weeks, til February 10th to give you a full update on what our (sic) all our options are and where we can go to resolve this in a positive way.

Goggin Decl. ¶ 24, Ex. 19.

Around the same time a website was launched at the domain name www.freefirecider.com. Hastings Decl. ¶¶ 8, 11, Ex. 5. Using www.freefirecider.com as a public forum, Defendants and others coordinated their efforts to oppose Shire City's registration of the term "fire cider" as a trademark. *Id*. Defendants did so in an effort to convince the USPTO to cancel Shire City's "fire cider" trademark or convince Shire City to cancel it. *See id*.

Blue drafted the mission statement and "unifying points" for the movement to cancel Shire City's registration of "fire cider." Hastings Decl. ¶ 13. In conjunction with this, Telkes started a Facebook page titled "Free Fire Cider," which was later taken down. Hastings Decl. ¶ 9; Telkes Decl. ¶ 9. Defendants Telkes and Blue created another Facebook page under the title "Tradition Not Trademarks." Hastings Decl.¶ 9, Ex. 4; Telkes Decl. ¶ 14. Defendants Telkes and Blue used the Traditions Not Trademarks Facebook page to provide updates on the dispute with Shire City and links to other web pages, such as www.freefirecider.com and the change.org petition. Hastings Decl. ¶ 10.

*Shire City Enforces Its Trademark Rights*

As the movement to oppose Shire City's registration of the term "fire cider" was building momentum, reports of Shire City removing products from the website Etsy, an online crafts marketplace, began to come in. Hastings Decl. ¶ 15. Specifically, it was reported that Shire City was using its registration of the term "fire cider" to cause Etsy to "take down" listings of non-Shire City versions of fire cider.[3] *Id.* In March, 2014, Langelier was approached by a representative of Shire City regarding her use of the term "fire cider" on her fire cider products.

---

[3] In fact, Blue received such a notice in relation to her own fire cider product in September, 2014. Hastings Decl. ¶ 24, Ex. 10. So has Telkes. Telkes Decl. ¶ 18, Ex. 4.

5

Langelier Decl. ¶ 8, Ex. 3.  In response to these communications Langelier changed her labels to read "fire tonic," but also used "aka Fire Cider" on the label as well.[4]  *Id.*

*The Boycott*

On January 27, 2014, a call to boycott Shire City's goods bearing the term "fire cider" was posted on the website www.freefirecider.com.  Defendants Blue and Telkes helped organize the boycott and all three Defendants encouraged others to do so.  Hastings Decl. ¶¶ 11, 14, 17; Telkes Decl. ¶ 10; Langelier Decl. ¶¶ 3, 5-7.  Specifically, Blue drafted one of the sample letters posted on www.freefirecider.com and helped plan and facilitate group meetings.  Hastings Decl. ¶ 11, Ex. 5.  Telkes contacted a local food cooperative in Texas (of which she was an owner) and attempted to use the store's existing procedure to remove Shire City's products, but was unsuccessful.[5]  Telkes Decl. ¶ 11.  Telkes also suggested to one other store that they should look into Shire City.  *Id.*  Langelier contacted a single Shire City retailer.  Langelier Decl. ¶ 5.  Langelier informed the store of the ongoing dispute between Shire City and the herbalist community over the term "fire cider," using the draft letter as a guide.  *Id.*  Neither Telkes' nor Langelier's efforts were successful.  Telkes Decl. ¶ 11; Langelier Decl. ¶ 5.  Neither contacted any additional stores.  *Id.*

On January 30, 2014, Ms. Gladstar and Blue sent an email letter to Shire City's principals noting the "huge movement on the web promoting a nationwide boycott on Shire Herbals Fire Cider" and suggesting that if Shire City was to make "a statement that you are relinquishing the trademark to Fire Cider" the boycott could be called off.  Hastings Decl. ¶ 16, Ex. 6.  Ms.

---

[4] This solution was not sufficient for Shire City.  Approximately one year later, Mr. Huebner again contacted Langelier regarding the use of the term "fire cider" on her labels.  Langelier Decl., ¶ 8, Ex. 3.  Langelier agreed to remove the "aka Fire Cider" from her labels but made clear to Mr. Huebner that she was against Shire City's registration of the term "fire cider."  *Id.*

[5] This procedure entailed obtaining a number of signatures in support of her actions.  Telkes Decl. ¶ 11.  Telkes was unable to accomplish this and Shire City's product remained in the store.  *Id.*

6

Gladstar and Ms. Blue further stated that their intentions were not to damage Shire City's business but rather "to keep generic, historical herbal terms free of trademarks and for anyone to use." *Id.* Ms. Gladstar and Ms. Blue asked Plaintiff to "[d]onate the "Fire Cider TM" to the herbal community. Working together we can all protect it from big companies with other important traditional herbal terms." *Id.*

*Shire City's Response*

On February 10, 2014, Shire City posted a message to its Facebook page stating, in relevant part, as follows:

> The only thing that will make the name 'fire cider' a generic term is a ruling from the USPTO. Challenging a trademark through the USPTO is a commonplace occurrence with clear rules and requirements, and we welcome anyone who would like to avail themselves of this path. This is legal, fair, and something to be expected as part of doing business. … Our trademark does not prevent anyone from making, teaching, writing about, sharing recipes for, or using 'fire cider.' What you make, teach or do on a small non-commercial scale is up to you – we wish you the best!

Hastings Decl. ¶ 18, Ex. 7.

Defendants Blue and Telkes and others continued to work to organize the opposition to Shire City's registration of the term "fire cider." Hastings Decl. ¶¶ 19-21; Telkes Decl. ¶¶ 13-16. As part of their efforts, Defendants referenced the movement to oppose Shire City's Registration on their individual websites and/or Facebook pages. Hastings Decl. ¶ 17; Telkes Decl. ¶¶ 13-16; Langelier Decl. ¶¶ 3, 6-7. A "World Fire Cider Day" event was organized that generated approximately 7,000 participants and followers, and Telkes hosted a free online workshop on how to make fire cider. Telkes Decl. ¶¶ 10,12. The possibility of filing a petition to cancel Shire City's registration of "fire cider" with the USPTO was also discussed. Hastings Decl. ¶¶ 20, 22; Telkes Decl. ¶ 15.

Support for the movement continued to grow. The petition started by Blue, for instance, continued to gain signatures. *See* Hastings Decl. ¶ 7, Ex. 3. Within the first week it had 5,000 signatures. *Id.* It currently has over 11,000 signatures. *Id.*

*The Cancellation Petitions and Shire City's Response*

In June, 2014, it started to become clear that the efforts to date were not likely to lead to the cancellation of the Registration of the "FIRE CIDER" mark. Hastings Decl. ¶ 23. Blue and Telkes decided to heed Plaintiff's suggestion and formally seek to cancel Shire City's Registration. Hastings Decl. ¶ 23; Telkes Decl. ¶ 17. On June 18, 2014, Blue and Telkes each filed a *pro se* petition to cancel Shire City's registration of "fire cider" (the "Petitions"). Goggin Decl. ¶¶ 2-3, Exs. 1-2.[6] In the fall of 2014, Telkes voluntarily withdrew her petition, along with all of the other *pro se* petitioners. Goggin Decl. ¶¶ 6-8, Exs. 5-7. Blue continued to prosecute her cancellation petition. Hastings Decl. ¶ 25.

The cancellation proceedings before the USPTO continued through the fall and winter of 2014/15. On April 16, 2015, Plaintiff filed the instant action against Blue, Telkes and Langelier. *See* Dkt. 1. The next day, Shire City sought to suspend the cancellation proceedings. Goggin Decl. ¶ 19, Ex. 18. Shire City's Complaint asserts ten counts against Defendants: (1) declaratory judgment on the validity of the mark FIRE CIDER; (2) trademark infringement under federal law; (3) false designation of origin under federal law; (4) trade disparagement under federal law; (5) common law trademark infringement; (6) common law unfair competition; (7) unfair trade practices under G.L. 93A; (8) tortious interference with contract; (9) tortious interference with prospective business relations; and (10) trade libel. This present motion to

---

[6] On June 30, 2014, a consortium known as "Southern Maine Herbalists" led by Lorna Henley filed a *pro se* petition to cancel Plaintiff's Registration. Goggin Decl. ¶ 4, Ex. 3. On September 15, 2014, on behalf of New Hampshire Herbal Network and Wintergreen Botanicals, Maria N. Groves filed another *pro se* petition to cancel Plaintiff's Registration. *Id.* ¶ 5, Ex. 4.

8

dismiss pertains to those counts in the Complaint directed solely at Defendants' petitioning activity, namely Counts IV, VII, VIII, IX and X.[7]

## I. Legal Standard

Anti-SLAPP laws are intended to remedy the mischief of lawsuits directed at individual citizens of modest means for speaking publicly. *Duracraft Corp.*, 691 N.E.1d at 940. SLAPP suits are "meritless suits" brought by private interests as a means of targeting and punishing common citizens for exercising their rights. *Id.* A claim may be dismissed pursuant to G.L. c. 231, § 59H when (a) the defendants' activities relate to a legislative or executive body or some other government proceeding; (b) the defendants' activities were "petitioning"; and (c) the "plaintiff's claims are based on the defendants' petitioning activities alone and have no substantial basis other than or in addition to the petitioning activities." *North American Expositions Co.*, 898 N.E.2d at 840-43. Once defendants make their threshold showing that plaintiff's claims are based on the defendants' petitioning activities, the burden shifts to the plaintiff to demonstrate, "by a preponderance of the evidence, that the defendant's petitioning activities were devoid of any reasonable factual support or any arguable basis in law, and that the petitioning activities caused actual injury to the plaintiff." *Id.* at 843. To carry its burden, the plaintiff must show that "no reasonable person could conclude that there was an arguable basis in law that would support the defendant's position." *Id.*

G.L. c. 231, § 59H defines protected petitioning activity broadly to include any of the following:

> any written or oral statement made before or submitted to a legislative, executive, or judicial body, or any other governmental proceeding; any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other governmental proceeding; any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive, or judicial body or any other

---

[7] *See* note 1, *supra*.

>governmental proceeding; any statement reasonably likely to enlist public participation in an effort to effect such consideration; or any other statement falling within constitutional protection of the right to petition government.

G.L. c 231, § 59H. As the foregoing indicates, the Massachusetts legislature intended to encompass a "very broad range of activities" within the definition of protected petitioning activities. *North American Expositions Co.*, 898 N.E.2d at 840-41. A claim may be dismissed under § 59H if it targets people for: "reporting violations of law, writing to government officials, attending public hearings, testifying before government bodies, circulating petitions for signature, lobbying for legislation, campaigning in initiative or referendum elections, filing agency protests or appeals, being parties in law-reform lawsuits, and engaging in peaceful boycotts and demonstrations." *Id.* (citing *Duracraft,* 691 N.E.2d at 940). "In order to determine if statements are petitioning, we consider them in the over-all context in which they were made." *Id. at* 841.

## II. The Court Should Hear The Present Motion

Special motions brought under § 59H are intended to resolve anti-SLAPP suits "quickly with minimum costs" by allowing a "procedural remedy for early dismissal." *Donavan v. Gardner*, 740 N.E.2d 639, 644 (Mass. App. Ct. 2000), (quoting *Duracraft v. Holmes Prods. Corp.*, 691 N.E.2d 935 (Mass. 1998)). Although G.L. c 231, § 59H provides that special motions to dismiss are *per se* timely if brought within 60 days of service of the Complaint, it also grants courts the discretion to entertain special motions to dismiss at any time thereafter that it deems appropriate. *See* G.L. c 231, § 59H (special motions to dismiss "may be brought within 60 days of the service of the Complaint or in the court's discretion at any later time upon terms it deems proper.").

10

This case remains in its infancy. Although service was completed more than 60 days prior to the filing of the present motion, the Rule 16 scheduling conference was held less than a month ago. *See* Dkt. 41 (Clerk's Notes for Proceedings). In addition, Shire City has not sought any written discovery from Defendants. Goggin Decl., ¶ 20. Defendants have also not sought any discovery.[8] *Id.* ¶ 21. Neither party has noticed any depositions. *Id.* ¶ 22. There are no motions pending. The only activity in this case to date has been Defendants' Motion to Stay, which, if granted, would have stayed the entire matter pending the parallel cancellation proceedings before the USPTO. *See* Dkt. 17. It is appropriate to hear the present motion given the present state of this dispute. *See, e.g., Donavan,* 740 N.E.2d at 642 (allowing a special motion to be heard three years after the complaint was filed).

## III.    Counts IV, VII, VIII, IX and X Target Defendants for Engaging in Petitioning Activity

Counts IV, VII, VIII, IX, and X are based on Defendants' work organizing the movement to oppose Shire City's Registration of the term "fire cider" and participation in the same movement. Shire City brought these claims despite explicitly inviting individuals to challenge their mark before the USPTO and despite having knowledge of the prior, generic use of the term. Shire City has not pointed to any other basis for these claims. *See generally* Dkt. 1. It cannot. Shire City's claims are only based on Defendants' protected activities.

### a.    Defendants Engaged in Petitioning Activity

Anti-SLAPP motions are typically resolved by looking to the pleadings and any supporting affidavits. G.L. c. 231, § 59H ("In making its determination, the court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based."). In the present case, as set forth more fully in Defendants' Motion for

---

[8] While the present motion remains pending, Defendants do not intend to seek discovery as to Counts IV, VII, VIII, IX, and X. *See* Goggin Decl. ¶ 23.

11

Judgment on the Pleadings, Shire City's Complaint primarily recites legal conclusions, rather than facts. *See, e.g.* Dkt. 1 at ¶¶ 31 (alleging that Defendants have published "false, misleading and/or disparaging statements…"), 37 (alleging that Defendants have circulated "false or misleading statements" regarding Shire City); *see generally* Dkt. 44 (Defendants' Memorandum in Support for Judgment on the Pleadings). Just as they would be disregarded for purposes of evaluating the sufficiency of a complaint, *see Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011), Shire City's threadbare legal conclusions should not be mistaken as facts for purposes of the present motion. Only the few facts that were properly plead deserve consideration. *See id.*

The from the Defendants' declarations, and the few alleged in the Complaint, can be summarized as follows: (a) Blue created a petition seeking signatures for those who supported the USPTO cancelling Shire City's registration of "FIRE CIDER"; (b) Defendants and others publically made their case that Shire City's "FIRE CIDER" mark is generic on [www.freefirecider.com](www.freefirecider.com) and other online forums; (c) Defendants Blue and Telkes filed the Petitions to cancel Shire City's "FIRE CIDER" Registration with the USPTO; (d) Defendants Blue and Telkes solicited evidence of the genericism of the term "fire cider"; (e) Defendants Blue and Telkes helped organize the boycott of Shire City's products; (f) Defendants Telkes and Langelier personally participated in the boycott; and (g) all Defendants encouraged others participate in the boycott in one way or another. Hastings Decl. ¶¶ 7-25; Telkes Decl. ¶¶ 6-19; Langelier Decl. ¶¶ 4-9.

Viewing all of these activities together, as is appropriate, quickly reveals that they all fall within the definition of "petitioning" activities for purposes of G.L. c. 231 § 59H. *See North American Expositions Co.*, 898 N.E.2d at 841 ("In order to determine if statements are

12

petitioning, we consider them in the over-all context in which they were made"). Filing the Petitions with the USPTO to cancel Shire City's Registration of "fire cider", as Defendants Blue and Telkes did, is clearly petitioning activity.[9]  *See* G.L. c. 231 § 50H (including "filing agency protests or appeals" within scope of petitioning activities).

Defendants' other activities either lead up to or were in furtherance of this. The petition created by Blue, for instance, was directed to two parties: Shire City *and* the USPTO. Hastings Decl. ¶ 7, Ex. 3. The petition itself states, *inter alia*, that the name fire cider "has become a household name for a blend of herbs historically used to prevent and support the body during times of colds and flu," and that it "is a cultural and historical term that should not be trademarked." *Id.* This was the precursor to Defendants Blue and Telkes filing the Petitions with USPTO. *Id.* When it became clear that the petition and boycott, by themselves, would not accomplish the goal of cancelling the "fire cider" registration, Defendants Blue and Telkes decided to take Shire City up on its offer and filed the Petitions. Hastings Decl. ¶ 23; Telkes Decl. ¶ 17.

Defendants' efforts to raise awareness of this dispute and garner support for their cause is similarly protected activity. Section 59H includes within the definition of petitioning activity "any statement reasonably likely to enlist public participation in an effort to effect [consideration or review of an issue by a public body]…." G.L. c. 231, § 59H. www.freefirecider.com contains such statements. This website worked in conjunction with the petition. It provided information regarding the historical use of the term "fire cider." Hastings Decl. ¶ 11, Ex. 5. It outlined the movement's position against Shire City's registration of the term "fire cider." *Id.* It also linked directly to the petition. *Id.* The website, and the statements made thereon, worked hand-in-hand with the petition towards the same goal: causing either the USPTO or Shire City to cancel the

---

[9] USPTO is a public agency. 35 U.S.C. § 1 (creating USPTO as agency within the US Department of Commerce).

"fire cider" registration.  *See id.*  The statements made on Defendants' individual websites and through social media were more of the same.  *See* Hastings Decl. ¶ 17; Telkes Decl. ¶¶ 13-16; Langelier Decl. ¶¶ 3, 6-7.  To the extent Shire City attempts to hold Defendants responsible for this content, it is petitioning activity.  *See Office One, Inc. v. Lopez*, 769 N.E.2d 749, 757 (Mass. 2002) (communications with fellow property owners to garner support for opposition to development project "petitioning" activity for purposes of G.L. c. 231, § 59H); *MacDonald v. Paton*, 782 N.E.2d 1089, 1093-94 (Mass. App. Ct. 2003) (statements made on website petitioning activities).

The boycott of Shire City's products was similarly intertwined with Defendants' other efforts to cancel the "fire cider" registration.  Peaceful boycotts (such as was organized here) are protected petitioning activity.  *See North American Expositions Co.*, 898 N.E.2d at 840-41 (peaceful boycotts and demonstrations are protected petitioning activity).  As the website www.freefirecider.com makes clear, the boycott was designed to further spread awareness of the opposition to the "fire cider."  Hastings Decl. ¶ 11, Ex. 5.  The website www.freefirecider.com set forth the parameters of the boycott.  *Id.*  It asked supporters to contact local business owners and "make them aware of the issue and ask for their support," but asked that supporters "communicate their concerns in a direct and respectful manner."  *Id.*  The organizers of the boycott made clear that "we don't want to harass [local businesses]…."  *Id.*  The website even provides a sample letter setting out the movement's position against the "Fire Cider" Registration, the facts supporting that petition, and asking the local business to consider supporting the boycott by ceasing to sell Shire City's product.  *Id.*  Contacting Shire City's retailers to inform them of the dispute, which Defendants Telkes and Langelier did only three times between them, is part and parcel with these efforts.  Telkes Decl. ¶ 11; Langelier Decl. ¶ 5.

Such statements are protected.  *See* G.L. c. 231, § 59H (statements intended to elicit public participation protected); *North American Expositions Co.*, 898 N.E.2d at 840-841 (peaceful boycotts protected).

### b.  Counts IV, VII, VIII, IX and X Have No Substantial Basis Beyond Defendants Petitioning Activity

Defendants' only connection to Shire City is the present dispute over the registration of "fire cider."  The only reason for Defendants to mention Shire City is the context of the dispute over the registration of "fire cider."  Hastings Decl. ¶ 27; Telkes Decl. ¶ 21; Langelier Decl. ¶ 10.  The only statements any Defendant has made concerning Shire City is in the context of that dispute.  *Id.*  The only activities Defendants engaged in concerning Shire City have been in the context of that dispute.  *Id.*  It is these statements and activities that Shire City now attacks.

Looking more closely at Counts IV, VII, and X, they are each a variations on a theme.  Each count alleges (in conclusory terms) that Defendants have made false or misleading statements about Shire City.  *See* Dkt. 1 at ¶¶ 71-80, 91-95.  The public statements Defendants have made about Shire City were in the context of the present dispute.  Hastings Decl. ¶ 27; Telkes Decl. ¶ 21; Langelier Decl. ¶ 10.  Shire City's Complaint does not identify any other statements.  *See generally* Dkt. 1.  As set forth above, all of the statements made on these websites were made in the course of Defendants petitioning activities.  Hastings Decl. ¶ 27; Telkes Decl. ¶ 21; Langelier Decl. ¶ 10.  Counts IV, VII, and X have no other apparent basis.  *See* Dkt. 1 at ¶¶ 63-67, 74-80, 91-95.

Counts VIII and XI are based upon statements Defendants allegedly made to Shire City's retailers, distributors or customers.  *See* Dkt. 1 at ¶¶ 81-90.  Only Defendants Telkes and Langelier made any such statements.  Telkes Decl. ¶ 11; Langelier ¶ 5.  The only statements that they made were in the course and furtherance of the boycott and overall movement.  *See* Telkes

15

Decl. ¶¶ 11, 21; Langelier Decl. ¶¶ 5, 10.  Counts VIII and XI do not identify statements or activities beyond this.  *See* Dkt. 1 at ¶¶ 81-90.  These counts have no other basis beyond this protected activity.  *See id.*

### c. Plaintiff Cannot Meet Its Burden to Demonstrate Defendants' Statements Were Devoid of an Arguable Basis in Fact or Law

At their core, Defendants' statements regarding Shire City express the belief that the term "fire cider" is a generic term, that the USPTO should not have allowed Shire City to register it as a trademark, and that Shire City's efforts to enforce their mark are inappropriate.  Defendants base these statements on the fact that Ms. Gladstar coined the term "fire cider" in the 1970s and that many, many people in the herbal community use that term to refer to a similar product.  Hastings Decl. ¶¶ 3-4; Telkes Decl. ¶¶ 3-4.

Defendants' statements enjoy strong support in the law.  The purpose of a trademark is to identify and distinguish the goods of one party from those of another. *See, e.g.*, *Colt Def. LLC v. Bushmaster Firearms, Inc.*, 486 F.3d 701, 705 (1st Cir. 2007).  To serve this purpose, a trademark must be "distinctive," *i.e.* identify the source of the good.  *Id.*  Trademarks exist along a spectrum of distinctiveness.  *See id.*  At one end are fanciful marks.  *See id.*  At the other are generic terms.  *See id.*

"Generic terms, being the least distinctive, receive no trademark protection." *Id.*  A term is generic if it is understood to describe a good, rather than the source of the good.  *Id.*  Put differently, "a generic term answers the question 'What are you?' while a mark answers the question 'Where do you come from?'" *Id.* (quoting 2 McCarthy on Trademarks and Unfair Competition § 12.1 (4th ed.)).  Only the latter can serve as trademarks.  *See id.*

The test for genericism is whether the "primary significance to the relevant public" of the term is to identify the nature of the good rather than its source.  *Id.*  The relevant public is not

16

necessarily the potential purchasing public as a whole. *Id.* at 709. The relevant public can, instead, be a subset of that group.[10] *See id.* Evidence of generic use can come from "any competent source." *Id.* at 706. This includes consumer surveys, use of the term in media publications, use by competitors in the industry, purchaser testimony and the plaintiff's own use of the term. *Id.*

There is overwhelming evidence of generic use of the term "fire cider." Ms. Gladstar, the individual credited with popularizing, if not coining, the term "fire cider," published two books containing recipes for a "fire cider" product. Goggin Decl. ¶¶ 9-10, Exs. 8-9. There are numerous examples of other "fire cider" products being offered for sale. *See, e.g.*, Goggin Decl, ¶ 11, Ex. 10, (Spicy Fire Cider); *id.* ¶ 12, Ex. 11 (Dragon's Breath Fire Cider); *id.* ¶ 13, Ex. 12 (Fire Cider)

In addition, there are many articles that demonstrate the generic nature of the term. One article, for instance, provides a recipe for "Fire Cider" and notes "[o]ne of the simple medicines that support your immune system and can be made at home is a remedy that herbalists call Fire Cider." *Id.* ¶ 18, Ex. 17. Another article describes fire cider as having been "traditionally used by many herbalists as a winter tonic, immune system booster, cold and flu fighter and peripheral circulation enhancer." *Id.* ¶ 17, Ex. 16. Another article notes that fall "always begins with a batch of Fire Cider brewing." *Id.* ¶ 16, Ex. 15. Yet another article states that "Fire Cider is a popular herbal remedy concocted by herbalists and plant people in colder months to be used as an immunity boosting tonic." *Id.* ¶ 15, Ex. 14. Another describes fire cider as "a concoction of hot peppers, ginger, garlic and apple cider vinegar," and a "health tonic that can boost immunity and improve circulation." *Id.* ¶ 14, Ex. 13. In each of these articles, "fire cider" is used not to

---

[10] Although a Registration Certificate indicating that a term is registered on the principal register at the USPTO gives rise to a presumption of distinctiveness, that presumption can be overcome. *See Colt Def. LLC.*, 486 F.3d at 705 (affirming grant of summary judgment finding that a registered trademark was generic).

identify a particular producer of a product.  *See id.* ¶¶ 14-18, Exs. 13-17.   Instead, it is being used to describe the product itself.  *See id.*  This is generic use.  *See Colt Def. LLC*, 486 F.3d at 705.

Shire City is aware of the generic use of the term "fire cider."  Dana St. Pierre, on behalf of Shire City, acknowledged that there is a "traditional use of the phrase fire cider."  Goggin Decl. ¶ 24, Ex. 19.  Representatives of Shire City have even used the term "fire cider" in its generic sense themselves.  In a response to an article regarding fire cider, Brian Huebner posted a comment noting that "[m]y sister and brother in law(sic) and I have been making *our own blend of Fire Cider* for a few months now (www.firecider.com)...."  Goggin Decl. ¶ 18, Ex. 18 at B000341 (emphasis added).  If the term "fire cider" served a trademark purpose, such a statement would make no sense.  It would be akin to saying that Mr. Huebner and his family make their own Pepsi or Sprite.  Mr. Huebner's statements can only be reasonably read to refer to a type of product (*i.e.* soda), not just the particular "blend" that he and his family produces (*i.e.* Pepsi or Sprite).

Despite this, Shire City maintains that it has developed goodwill and trademark rights in the term "fire cider."  *See* Dkt. 1.  The fact that Shire City has invested time and money trying to develop good will in the term "fire cider" does not entitle it to trademark rights.  "No matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise and what success it has achieved in securing public identification, it cannot deprive competing manufacturers of the product of the right to call an article by its name." *Miller Brewing Co. v. Falstaff Brewing Co.*, 655 F.2d 5, 8 (1st Cir. 1981) (internal quotations omitted).  To hold otherwise would grant Shire City a monopoly over the language necessary to describe a product that is sold all across the country.  *See id.* ("To allow trademark protection for generic

terms, i.e. terms which describe the genus of goods being sold, would grant the owner of the mark a monopoly since a competitor could not describe his goods as what they are.").

The evidence overwhelmingly points towards the term "fire cider" being generic. At the very least, Shire City cannot establish that the Defendants lacked an arguable basis in fact and law for publically stating that fire cider is generic.

### d.  Defendants Are Entitled to Their Costs and Reasonable Attorneys' Fees.

If a court grants a special motion to dismiss under G.L. c 231, § 59H, the moving parties are to be awarded their costs and reasonable attorneys' fees. *See North American Expositions Co.*, 898 N.E.2d at 848 (G.L. c. 231 § 59H leaves no discretion whether to make fee award). This includes those costs and fees incurred in preparing the special motion to dismiss. G.L. c. 231 § 59H (fees to be awarded include "those incurred for the special motion and any related discovery matters."). Should the present motion be granted, Defendants will file a separate motion documenting their costs and reasonable attorneys' fees.

### CONCLUSION

For the reasons set forth above, Defendants Mary Blue, Nicole Telkes, and Katheryn Langelier respectfully request that the Court grant their special motion to dismiss pursuant to G.L. c. 231, § 59H and award them their costs and reasonable attorneys fees.

Dated:  November 20, 2015 /s/ James G. Goggin
Martha Gaythwaite, BBO # 187650
James G. Goggin, *Admitted Pro Hac Vice*
Verrill Dana, LLP
One Portland Square
Portland, ME  04112
(207) 253-4602
mgaythwaite@verrilldana.com
jgoggin@verrilldana.com

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on November 20, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following persons at the given email addresses:

Paul C. Rapp, Esq.
348 Long Pond Road
Housatonic, MA  01236
paul@paulrapp.com

Sonya del Peral, Esq.
22 Park Row
Chatham, NY  12037
sdp@sdplaw.com


Dated:  November 20, 2015 /s/ James G. Goggin
James G. Goggin