UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SHIRE CITY HERBALS, INC., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil No. 15-30069-MGM |
| MARY BLUE d/b/a FARMACY HERBS, | * | |
| NICOLE TELKES d/b/a WILDFLOWER | * | |
| SCHOOL OF BOTANICAL MEDICINE | * | |
| and/or WILD SPIRIT HERBS, and | * | |
| KATHERYN LANGELIER d/b/a HERBAL | * | |
| REVOLUTION, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM AND ORDER REGARDING DEFENDANTS' SPECIAL MOTION
TO DISMISS PURSUANT TO MASS. GEN. LAWS CH. 231, § 59H
(Dkt. No. 45)

May 12, 2016

MASTROIANNI, U.S.D.J.

## I.  INTRODUCTION

Shire City Herbals, Inc. ("Plaintiff") brings a number of claims against Mary Blue d/b/a

Farmacy Herbs, Nicole Telkes d/b/a Wildflower School of Botanical Medicine and/or Wild Spirit

Herbs, and Katheryn Langelier d/b/a Herbal Revolution (together, "Defendants"). The suit arises

out of Defendants' alleged behavior relating to Plaintiff's federally registered trademark, FIRE

CIDER® (the "Fire Cider Mark"). Plaintiff's claims are grouped into five trademark-infringement

claims and five non-trademark-infringement claims. The non-trademark-infringement claims are for

trade disparagement in violation of the Lanham Act (Count IV), unfair trade practices in violation of

Mass. Gen. Laws ch. 93A, § 11 (Count VII), tortious interference with contractual relations (Count

VIII), tortious interference with prospective business relations (Count IX), and trade libel (Count

X). Defendants filed a special motion to dismiss, pursuant to Mass. Gen. Laws ch. 231, § 59H,

seeking only to dismiss the non-trademark-infringement claims. The court allows Defendants' special motion to dismiss in its entirety.

## II.   FACTS[1]

Plaintiff is a corporation with a principal place of business in Pittsfield, Massachusetts. (Dkt. No. 68, Am. Compl. ¶ 5.) Plaintiff manufactures and sells a tonic product comprised of apple cider vinegar, citrus, honey, and spices, which it markets as FIRE CIDER®. (*Id.* ¶¶ 2, 6.) Plaintiff obtained the Fire Cider Mark on December 18, 2012. (*Id.* ¶ 14.) Plaintiff has existing business relationships and is developing prospective business relationships in Massachusetts and elsewhere. (*Id.* ¶ 19.) After obtaining the Fire Cider Mark, Plaintiff began objecting to and seeking removal of similar uses of "fire cider" on commercial websites. (Dkt. No. 52-4, Pl.'s Mem. Opp. Special Mot. to Dismiss ("Pl.'s Mem.") at 2.) Defendants are individuals living in Maine, Rhode Island, and Texas, who do business under various trade names. (Am. Compl. ¶¶ 7-9.) They manufacture and sell tonic products similar to Plaintiff's product. (*Id.*) Defendants have claimed that the Fire Cider Mark is generic, and therefore invalid. Defendants have also demanded that Plaintiff give up its rights in the Fire Cider Mark. (*Id.* ¶¶ 21-22.) The crux of Defendants' argument is that "fire cider" is a generic description that has been used by herbalists for decades to describe a type of product similar to Plaintiff's and Defendants' products.

On January 25, 2014, Defendant Blue saw a blog post discussing Plaintiff's registration of the Fire Cider Mark. (Dkt. No. 48, First Blue Decl. ¶ 5.) On January 26, 2014, Defendant Blue created a petition at www.change.org designed to gather signatures in support of canceling the Fire Cider Mark. (Dkt. No. 46, Defs.' Mem. Supp. Special Mot. to Dismiss ("Defs.' Mem.") at 4.) The petition had over 2,000 signatures within 24 hours (*see id.*) and currently has over 11,000 signatures.

---

[1] As directed by Mass. Gen. Laws ch. 231, § 59H, the facts are drawn from the parties' pleadings and affidavits in addition to the amended complaint.

Also on January 26, 2014, Plaintiff published a blog entry stating it had obtained the trademark to protect itself from larger companies and would discuss the matter with its lawyer. (Dkt. No. 47, First Goggin Decl., Ex. 19.) On January 27, 2014, Defendant Telkes sent an email to Plaintiff asking it to give up the Fire Cider Mark. (Dkt. No. 49, First Telkes Decl., Ex. 1.) In the email, Defendant Telkes stated, "Fire Cider is an exciting and popular remedy that many of my students and friends have wanted me to either mass market or they themselves have been pushed in this direction," and also stated, "I really don't want to see you completely lose all of your business after all of the hard work you have done." (*Id.*) That same day, Plaintiff responded that it would discuss the matter with its lawyer. (*Id.*)

On January 27, 2014, Defendants began organizing a boycott of Plaintiff's product. (Defs.' Mem. at 6.) According to Defendants, they sought to unite the herbalist community behind a movement to have Plaintiff's Fire Cider Mark canceled either by the U.S. Trademark Trial and Appeal Board ("TTAB") or by Plaintiff itself. (*Id.* at 5.) Defendants created a website, www.freefirecider.com, and various Facebook pages, including the "Traditions not Trademarks" page. (Am. Compl. ¶¶ 30-31.) These pages have been promoted to approximately 10,000 individuals. (*Id.* ¶ 32.) Defendants have published numerous statements to the website and the Facebook pages that Plaintiff alleges to be false, misleading, deceptive, and/or disparaging. (*Id.* ¶ 33.) Specifically, Plaintiff alleges Defendants made the following wrongful statements: that Plaintiff had sued other herbal companies (*id.* ¶ 34), that Plaintiff claimed to have originated the recipe sold under the Fire Cider Mark (*id.* ¶ 35), that Plaintiff claimed other herbalists would be legally barred from selling similar recipes (*id.*), that Plaintiff was forcing other herbalists to stop making and selling tonics similar to the one sold by Plaintiff, (*id.* ¶ 36), and that Plaintiff was asking retailers to remove other herbalists' tonics from their shelves. (*Id.* ¶ 37.) Plaintiff also points to statements relating to the educational background of its principal. (*Id.* ¶ 38.)

On February 10, 2014, Plaintiff posted a message to Facebook stating that the only way to make "fire cider" a generic term would be to obtain a ruling from the TTAB. (Defs.' Mem. at 7.) On June 18, 2014, Defendant Blue filed a *pro se* cancelation petition with the TTAB. (*Id.* at 8.) On April 16, 2015, Plaintiff filed this action against Defendants, transferring consideration of the trademark from the TTAB to this court and adding claims that were unavailable before the TTAB, including those that are the subject of the special motion to dismiss. (*Id.*)

Defendants have used their own websites and Facebook pages, which also promote their own products, to link to the pages supporting the boycott of Plaintiff. (*Id.* at 7.) Defendant Blue uploaded sample letters to www.freefirecider.com for Defendants and others to send to Plaintiff's retail accounts. (Am. Compl. ¶ 39.) According to Plaintiff, the letters demanded that Plaintiff's retail accounts remove Plaintiff's product from their shelves and replace it with similar products made by Defendants and others. (*Id.*) Plaintiff has attached a sample letter to one of its pleadings that asks stores "to consider stocking a locally made Fire Cider in your store and removing Fire Cider made by [Plaintiff] from your shelves until they revoke the trademark." (Dkt. No. 52-9.) Currently, the sample letter on www.freefirecider.com only requests that Plaintiff's product be removed and does not mention replacing it with other products.

Defendants have incited others to contact Plaintiff's retail accounts via letters, phone calls, and personal visits, in order to provide allegedly wrongful information and demand that Plaintiff's product be removed from their shelves. (Am. Compl. ¶¶ 40, 42-43.) For their own part, Defendants Langelier and Telkes contacted certain of Plaintiff's retail accounts. (*Id.* ¶ 41.) Defendant Telkes contacted a food cooperative in Texas, of which she was a partial owner, to ask it to remove Plaintiff's product from its shelves, but she was unsuccessful. (Defs.' Mem. at 6.) While traveling in New England, Defendant Telkes saw Plaintiff's product being sold in another store, and suggested that the store "do their research" on Plaintiff. (First Telkes Decl. ¶ 11.) Defendant Langelier

contacted a store in Maine to request that it join the boycott, but she was unsuccessful. (Dkt. No. 50, First Langelier Decl. ¶ 5.) Defendant Blue states she has taken time away from her own business to work on the movement to cancel the Fire Cider Mark. (Dkt. No. 56, Second Blue Decl. ¶ 7.) On May 29, 2015, she turned down a new retail account and directed the retailer to the section of www.freefirecider.com listing alternative producers. (*Id.*, Ex. 3.) In December 2015, Defendants donated their products to be sold on an Etsy shop. (Dkt. No. 53, Affirmation of Paul C. Rapp ¶ 5.) Defendants point out the shop was created after this action was filed, is meant to raise money for their legal costs, and includes products from other herbalists. (Dkt. No. 55, Defs.' Reply Mem. Supp. Special Mot. to Dismiss at 7.)

Allegedly as a result of Defendants' actions, Plaintiff has lost business with existing and prospective retail accounts, some of which are carrying Defendants' products instead. (Am. Compl. ¶¶ 45-47.) Defendant Langelier's website is linked in the "alternative producers of fire cider" section of www.freefirecider.com. (Pl.'s Mem. at 3-4.) Defendant Blue points out this section of the website was created after the filing of this action. (Second Blue Decl. ¶ 4.) According to Plaintiff, Defendant Langelier's product has replaced Plaintiff's in numerous stores. (Pl.'s Mem. at 3-4.) The supporting declaration of one of Plaintiff's principals identifies two specific stores that stated they were carrying Defendant Langelier's product instead of Plaintiff's. (Dkt. No. 52-3, Huebner Decl. ¶¶ 7-8.) Defendant Langelier states these stores initiated contact with her. (Dkt. No. 57, Second Langelier Decl. ¶ 4.) Defendant Telkes's product is now carried in a store with which Plaintiff had been negotiating, but which will no longer deal with Plaintiff. (Pl.'s Mem. at 4.)

## III.   DISCUSSION

The special motion to dismiss is brought pursuant to Mass. Gen. Laws ch. 231, § 59H, which is commonly known as the "anti-SLAPP law." "SLAPP" stands for "strategic litigation against public participation." SLAPP suits are "generally meritless suits brought by large private

interests to deter common citizens from exercising their political or legal rights or to punish them for doing so." *Duracraft Corp. v. Holmes Prods. Corp.*, 691 N.E.2d 935, 940 (Mass. 1998). "The objective of SLAPP suits is not to win them, but to use litigation to intimidate opponents' exercise of rights of petitioning and speech." *Id.* To counter this, the anti-SLAPP law allows a party to bring a special motion to dismiss claims that "are based on said party's exercise of its right of petition under the constitution of the United States or of the commonwealth." Mass. Gen. Laws ch. 231, § 59H. The purpose of the law is "to dispose expeditiously of meritless lawsuits that may chill petitioning activity." *Duracraft*, 691 N.E.2d at 943.

### A.      Timeliness of Special Motion to Dismiss

The initial complaint was filed on April 16, 2015. (Dkt. No. 1.) Defendant Blue was served on April 20, 2015, Defendant Telkes on April 22, 2015, and Defendant Langelier on April 30, 2015. (Dkt. No. 8.) On June 22, 2015, Defendants' answers raised the anti-SLAPP law as an affirmative defense. (Dkt. Nos. 20-22.) On October 20, 2015, the parties filed a joint statement indicating Defendants would file a special motion to dismiss. (Dkt. No. 40.) The court's scheduling order, issued October 29, 2015, contemplated the filing of early dispositive motions by November 20, 2015. (Dkt. No. 42.) On November 20, 2015, Defendants filed the special motion to dismiss. (Dkt. No. 45.) On February 16, 2016, Plaintiff filed an amended complaint. (Dkt. No. 68.) The special motion to dismiss remained outstanding after the filing of the amended complaint.

Plaintiff argued, prior to filing its amended complaint, that the special motion to dismiss should be disregarded as untimely because it came more than sixty days after the initial complaint, and it continues to press this argument despite its filing of an amended complaint. The anti-SLAPP law states a "special motion to dismiss may be filed within sixty days of the service of the complaint or, in the court's discretion, at any later time upon terms it deems proper." Mass. Gen. Laws ch. 231, § 59H. Both sides have cited cases in which courts heard a special motion to dismiss based on

developments that took place years after the initial complaint. *See Pritchard v. Malm*, 9 N.E.3d 348

(Mass. App. Ct. 2014); *Donavan v. Gardner*, 740 N.E.2d 639, 644 (Mass. App. Ct. 2000). Additionally,

as both sides have argued in the context of various pleadings, little discovery has taken place and the

case is in its infancy, so hearing the special motion to dismiss now, despite the delay, would be in

accord with the anti-SLAPP law's purpose of promoting early resolution of suits. The court will

therefore exercise its discretion to hear the special motion to dismiss at this time.

      **B.**    **Anti-SLAPP Law**

      1.    <u>Petitioning Activities</u>

      The anti-SLAPP law is intended to allow a party to dismiss claims that "are based on said

party's exercise of its right of petition." Mass. Gen. Laws ch. 231, § 59H. Construing the statute in

order to avoid unconstitutionality and preserve its intent, the Massachusetts Supreme Judicial Court

has held that the moving party must "make a threshold showing through the pleadings and affidavits

that the claims against it are 'based on' the petitioning activities alone and have no substantial basis

other than or in addition to the petitioning activities." *Duracraft*, 691 N.E.2d at 943.[2] Plaintiff argues

that Defendants cannot meet their threshold burden of showing the claims are based solely on

petitioning activities. The anti-SLAPP law defines "a party's exercise of its right of petition" as

follows:

> [1] any written or oral statement made before or submitted to a legislative, executive, or judicial body, or any other governmental proceeding; [2] any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other governmental proceeding; [3] any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive, or judicial body or any other governmental proceeding; [4] any statement reasonably likely to enlist public participation in an effort to effect such consideration; or [5] any other statement falling within constitutional protection of the right to petition government.

---

[2] Although the anti-SLAPP law speaks of petitioning "statements," *Duracraft* and subsequent cases have consistently interpreted it to cover petitioning "activities" as well.

Mass. Gen. Laws ch. 231, § 59H.

"In order to determine if statements are petitioning, [courts] consider them in the over-all context in which they were made." *N. Am. Expositions Co. Ltd. P'ship v. Corcoran*, 898 N.E.2d 831, 841 (Mass. 2009). While "[t]he typical mischief that the legislation intended to remedy was lawsuits directed at individual citizens of modest means for speaking publicly against development projects," *Duracraft*, 691 N.E.2d at 940, "the statute provides broad protection for other petitioning activities as well." *Office One, Inc. v. Lopez*, 769 N.E.2d 749, 757 (Mass. 2002). "It is not necessary that the challenged activity be motivated by a matter of public concern." *Id.* At the same time, protected activity is limited to petitioning in the "constitutional sense," meaning activities "seeking from the government any form of redress for a grievance of [one's] own or otherwise petitioning on [one's] own behalf." *Kobrin v. Gastfriend*, 821 N.E.2d 60, 63 (Mass. 2005).

Defendants argue their activities are meant to effect the cancelation of Plaintiff's trademark, and are therefore petitioning activities. Plaintiff characterizes Defendants' actions as commercial activities designed to cripple Plaintiff's business and create opportunities for their own businesses. Considering the activities in their "over-all context," and mindful of the anti-SLAPP law's broad scope and "broad protection," the court agrees with Defendants. The court is persuaded that Defendants' goal from the start was to cancel the Fire Cider Mark, and their activities took place in the context of achieving that goal. Defendants' actions consist largely of publishing statements, gathering signatures, speaking with retail establishments, and organizing a boycott with the purpose of canceling the Fire Cider Mark. These activities fall variously within the realms of statements "reasonably likely to encourage consideration or review of an issue" by a government body, statements "reasonably likely to enlist public participation in an effort to effect such consideration," and "any other statement falling within constitutional protection of the right to petition government."

8

It is of little consequence that Defendants' initial actions occurred before formal cancelation proceedings began in front of the TTAB. "Statements made outside any formal governmental proceedings have often been considered petitioning activity." *Corcoran*, 898 N.E.2d at 841. "Petitioning includes all statements made to influence, inform, or at the very least, reach governmental bodies—either directly or indirectly," and Defendants' statements clearly fall within this rubric. *Id.* The fact that Defendants did not choose to file a cancelation proceeding with the TTAB until later does not change the nature of their actions, especially given that they had no experience in intellectual property matters and no legal representation even after the TTAB cancelation proceedings began.

A mere "oblique reference," "tangential comment," or "incidental observation" regarding genuine petitioning activity is not protected by the anti-SLAPP law. *Glob. NAPS, Inc. v. Verizon New England, Inc.*, 828 N.E.2d 529, 530, 533, 534 (Mass. App. Ct. 2005). More specifically, the anti-SLAPP law "does not protect tangential statements intended, at most, to influence public opinion in a general way unrelated to governmental involvement." *Id.* at 534. In this case, given the focus on having the Fire Cider Mark canceled, Defendants' statements were not tangential statements or unrelated to governmental involvement. While "[i]ndividuals who petition the government are not necessarily free to engage in gratuitous publication of the petition elsewhere without consequence," *Kalter v. Wood*, 855 N.E.2d 421, 424 (Mass. App. Ct. 2006), there is no hint of Defendants engaging in such gratuitous publication here.

Defendants may have obtained some commercial benefits in connection with the ongoing attempts to have the Fire Cider Mark canceled, insofar as their products have been listed as alternatives to Plaintiff's product on www.freefirecider.com and are carried at stores that no longer stock Plaintiff's product. At the same time, there is evidence these stores initiated contact with Defendants, and not the other way around. According to Defendant Blue, the listing of alternative

products did not take place until after this suit was filed, and all Defendants point out that the Etsy shop selling their products is meant to raise legal funds and includes products from other herbalists. Viewed in their overall context, it is difficult to see how these commercial benefits could be considered evidence indicating Defendants' statements are secretly designed to promote their own products or serve as cover for the real purpose of selling them.

Even if Defendants have commercial motivations for their actions, "the motive behind the petitioning activity is irrelevant at this initial stage. The focus solely is on the conduct complained of, and, if the only conduct complained of is petitioning activity, then there can be no other 'substantial basis' for the claim." *Office One*, 769 N.E.2d at 757 (citation omitted). Actions can have economic or commercial motives, or even be based entirely on economic self-interest, and still qualify as petitioning activities for purposes of the anti-SLAPP law. *See Corcoran*, 898 N.E.2d at 842 ("[T]he fact that the speech involves a commercial motive does not mean it is not petitioning."); *Office One*, 769 N.E.2d at 758 (the moving party's "entitlement to petition . . . exists notwithstanding the fact that she was doing so purely for economic self-interest"). In *Cadle Co. v. Schlichtmann*, 859 N.E.2d 858, 866 (Mass. 2007), the Supreme Judicial Court stated that "palpable commercial motivation" can reveal that activities lack "petitioning character," but Defendants' activities in this case fall far short of exhibiting such conspicuous commercial motives.

In *Office One*, the defendant asked the government entity owning a commercial property to reconsider selling it to the plaintiff due to the indecent nature of the plaintiff's business, and further asked that the property be sold to the defendant instead. The court found this to be petitioning activity despite the obvious commercial motivations involved and granted the defendant's special motion to dismiss. 769 N.E.2d at 757-58. In *Cadle*, the defendant attorney represented himself and clients in cases against the plaintiff, a debt collection agency. He created a website sponsored by his law firm that accused the plaintiff of illegal actions, and the website directed potential claimants to

contact the firm. The Supreme Judicial Court found that the website "was, in essence, designed" by the defendant to "attract clients to his law practice" and to gain a tactical advantage in ongoing proceedings, and was therefore commercial in nature and undeserving of anti-SLAPP protection. 859 N.E.2d at 864, 867.

Two years later, the Supreme Judicial Court decided *Corcoran*. There, the defendant owned and operated the Bayside Expo Center, which was facing competition from the new, publicly funded Boston Convention and Exhibition Center. The defendant met with the government foundation that operated the Boston Convention and Exhibition Center and asked that it maintain an interpretation of its enabling legislation that prohibited the plaintiff from holding certain shows at the Boston Convention and Exhibition Center. In addition to offering his interpretation of the relevant legislation, the defendant argued that reversal of the policy would hurt his own business at the Bayside Expo Center. 898 N.E.2d at 836-38. The Supreme Judicial Court distinguished *Cadle*, which it found "involved very different circumstances," on the basis of the fact that the *Corcoran* defendant merely "gave . . . his opinion" and "sought redress" from the foundation, thereby engaging in "precisely the type of communication protected under the anti-SLAPP statute." *Id.* at 842. Thus, the Supreme Judicial Court found that the defendant's actions, while involving commercial motivations, were still petitioning activities. *Id.*

Defendants' actions and statements in this case are, at the very most, petitioning activities with some commercial effects, and are not commercial activities in and of themselves. The fact that Defendants sell their products on their websites and also use their websites to organize the campaign to cancel the Fire Cider Mark is a far cry from the "palpable commercial motivation behind the creation" of the website in *Cadle*, 859 N.E.2d at 866. If anything, the evidence of commercial motivations behind Defendants' actions is significantly weaker than the evidence of economic motives behind the protected activities in *Corcoran* and *Office One*. *See also Wynne v. Creigle*, 825 N.E.2d

559 (Mass. App. Ct. 2005) (defendant's statements to media and disciplinary committee about plaintiff's role in husband's suicide made during campaign for legislation granting benefits to deceased firefighters' widows held to be petitioning activity). Publishing statements and organizing a boycott are quintessential petitioning activities. The commercial effects of Defendants' opposition to the Fire Cider Mark do not change the nature of their activities, nor does the fact that the boycott had the intended effect of decreasing retailers' willingness to stock Plaintiff's product.

2.      Reasonable Factual Support or Arguable Basis in Law

Because Defendants have made their threshold showing regarding petitioning activities, the burden shifts to Plaintiff to show that "(1) the moving party's exercise of its right to petition was devoid of any reasonable factual support or any arguable basis in law and (2) the moving party's acts caused actual injury to the responding party." Mass. Gen. Laws ch. 231, § 59H; *see also Duracraft*, 691 N.E.2d at 943. Plaintiff is unable to meet its burden at this stage. Given Defendants' genuine belief that the Fire Cider Mark is invalid and the fact that the trademark dispute will continue regardless of the outcome on this special motion to dismiss, it is clear that Defendants' actions were not devoid of any reasonable factual support or any arguable basis in law. *See Corcoran*, 898 N.E.2d at 844-45 (finding plaintiff unable to satisfy burden when defendant had "plausible" and "reasonable" arguments supporting the position that was the focus of his petitioning activities). Plaintiff's brief does not argue otherwise.

## IV.   CONCLUSION

Defendants' special motion to dismiss (Dkt. No. 45) is ALLOWED in its entirety. Accordingly, Counts IV, VII, VIII, IX, and X are dismissed.

It is So Ordered.

    _/s/ Mark G. Mastroianni_____
    MARK G. MASTROIANNI
    United States District Judge