SHIRE CITY HERBALS, INC.,

    Plaintiff,

    v.

MARY BLUE d/b/a FARMACY HERBS, et al.,

    Defendants.

Civil Action No. 15-30069-MGM

## FINDINGS OF FACT AND RULINGS OF LAW FOLLOWING JURY-WAIVED TRIAL

September 30, 2019

MASTROIANNI, U.S.D.J.

# I.      INTRODUCTION

Plaintiff Shire City Herbals, Inc. ("Plaintiff" or "Shire City") alleges the following

Defendants infringe its registered trademark Fire Cider[1]: Mary Blue (or Mary Blue Hastings) d/b/a

Farmacy Herbs, Nicole Telkes d/b/a Wildflower School of Botanical Medicine and/or Wild Spirit

Herbs, Wildflowers & Weeds LLC, Katheryn Langelier d/b/a Herbal Revolution, and Herbal

Revolution Farm & Apothecary LLC. Defendants brought counterclaims for declaratory judgment

and under Mass. Gen. Laws ch. 93A. The following counts were tried in a jury-waived trial on

March 25-29, April 1, May 13-14, and July 2, 2019:

> Count 1: declaratory judgment that the mark is distinctive and valid (which is related
> to Counterclaim Count 1),

---

[1] Capitalized references to Fire Cider mean Plaintiff's mark or product. Lower case references to fire cider refer to the term generally or to other producers' versions of products similar to Plaintiff's. However, when the term is in a direct quotation from a trial exhibit, the use of capital or lower case letters reflects how the term appears in the exhibit, regardless of whether the exhibit refers to Plaintiff's product. For example, footnote 3 includes the following quotation from Defense Exhibit 263, which is an email sent to Plaintiff: "I am familiar with Fire Cider, as I make it myself." The writer capitalized the term but was not referring to Plaintiff's product.

Counterclaim Count 1: declaratory judgment that the mark is generic or descriptive and without secondary meaning (which is related to Count 1),

Count 2: trademark infringement (15 U.S.C. § 1114(1)),

Count 3: false designation of origin (15 U.S.C. § 1125(a)),

Count 5: common law trademark infringement,

Count 6: common law unfair competition, and

Counterclaim Count 2: Mass. Gen. Laws ch. 93A, § 11.

The key issue is whether Fire Cider is generic, which depends on the relevant purchasing public's understanding of the term. A term can be generic in one of two ways: an invented term can become generic through common usage over time, or a term can be generic ab initio, meaning it was commonly used before it became associated with a specific product. Either way, a generic term cannot be a trademark. Defendants contend fire cider is generic because it has always been generic within the herbalist community, which used the term long before Plaintiff. Plaintiff concedes the term was generic in the narrow herbalist community but argues it is not generic within the broader community, the broader community's understanding of the term controls, and Defendants tried to genericize the term to prevent Plaintiff from enforcing its mark. Because Plaintiff registered Fire Cider on the Principal Register, there is a presumption that the mark is valid. As explained in detail in the following findings of fact and conclusions of law, Defendants met their burden of proving that fire cider was generic at the time Plaintiff began selling Fire Cider and applied for registration.

## II.       FINDINGS OF FACT

### A.       Shire City and Its Development of Fire Cider

Shire City owns U.S. Trademark No. 4,260,851 for Fire Cider. (P. Ex. 21.) Fire Cider is registered on the Principal Register as a dietary supplement drink. (*Id.*) Throughout the trial, Fire Cider and similar products were referred to as a type of vinegar tonic, tincture, or oxymel.

Shire City was formed by Dana St. Pierre; his wife, Amy Huebner; and her brother, Brian Huebner.[2] They do not identify as herbalists and have not taken herbalism classes. St. Pierre was exposed to herbal remedies at a young age by his grandmother. In high school, he began making his own remedies. While living in Arizona in the late 1990s, he brought jars of his remedies to a potluck; one was a mixture of vinegar, honey, garlic, and horseradish. A man at the potluck to whom St. Pierre referred as "a hippie" called the mixture "fire cider." St. Pierre liked the name and started using it to refer to his mixture. St. Pierre's former roommate contests this series of events, claiming St. Pierre got the recipe from someone when he was living in Arizona, the recipe was handwritten on an index card, and fire cider was written on the index card. (Dkt. No. 238 at 6:20-7:13, 15:9-16:3.) The former roommate has seen the index card but does not know who gave it to St. Pierre.

In the fall of 2009, Amy Huebner tried St. Pierre's Fire Cider to ward off a cold and was impressed with the results. She did not like the flavor and wanted to make it taste better so she could drink it daily. She and St. Pierre revised the recipe several times and made test batches in the winter of 2009 into 2010. They recorded the recipe they liked best and stored batches until the fall of 2010. A friend invited them to sell homemade goods at a holiday fair in Pittsfield, Massachusetts in December 2010. They invested roughly $1,000 into buying materials and ingredients to make Fire Cider for the fair. They handed out samples at the fair and sold all of the roughly 80 bottles they had brought with them. They made just over $2,000 in gross sales of Fire Cider.

Believing they had a hit product, they spent the next several months setting up a business, Shire City, to manufacture and sell Fire Cider. From the holiday fair until September 2011, they sold refills to friends and neighbors out of their home. They also got a wholesale license, insurance, lab testing to create a dietary supplement panel (which is similar to a nutrition facts label but is used on

---

[2] To avoid confusion, the Huebners are individually referred to by their first and last names.

dietary supplements), FDA approval, and a product barcode. By September 2011, Shire City had the necessary licenses and approvals to start selling Fire Cider wholesale. They set up a website through which they could sell Fire Cider directly to consumers. They also created a Facebook page and other social media accounts to promote the product. In setting up Shire City's online presence and during his efforts at search engine optimization, Brian Huebner testified that he did not see any websites offering fire cider commercially. (He did see several alcohol-related websites regarding fire cider products, which he believes were Canadian.)

Shire City's goal was to get anyone and everyone to try Fire Cider, and within approximately four years, Shire City had given out roughly 1 million samples. To do that, St. Pierre and the Huebners contacted retailers and distributors, did in-store demonstrations and samplings, and attended festivals, expos, trade shows, and other events. By the end of 2011, Shire City had approximately two dozen wholesale relationships with cafes, coffee shops, health food stores, co-ops, liquor stores, and bars. In 2012, Shire City got its first account with a large chain, MOM's Organic Market, which has locations in the mid-Atlantic. Shire City then got a deal with an organic produce distributor that distributed Fire Cider to retailers in New York and New Jersey. Shire City started working with other distributors in New England, New York, Pennsylvania, and the mid-Atlantic. Between 2015 and 2017, Shire City got deals for several large chains to stock Fire Cider, including Big Y (approximately 60-70 stores), Sprouts (approximately 250 stores), and GNC (approximately 4,500 U.S. stores). In 2018, Shire City began wholesale relationships in Canada with conventional grocery stores, natural foods stores, and chains. Currently, Fire Cider is sold in more than 5,000 brick and mortar stores across all 50 states. The types of stores include big chain stores, supermarkets, natural foods stores, health- and nutrition-related stores, liquor stores, cafes, bakeries, restaurants, general stores, co-ops, CrossFit gyms, yoga studios, a rock-climbing gym, chiropractors' offices, and a store in Logan Airport that sells Massachusetts products. Fire Cider is also sold online

on Shire City's website, Amazon (from individuals who buy Fire Cider wholesale from Shire City and resell it at retail prices), Walmart's website, GNC's website, Jet.com, LuckyVitamin.com, and elsewhere. Through its own website, Shire City has shipped Fire Cider to buyers in Central and South America, the United Kingdom, Asia, and Australia. Shire City currently sells three versions of Fire Cider: original, unsweetened, and African Bronze, which is made with a dark, smoky honey.

Shire City targets a broader market than just the herbalist community. This is shown by the variety of types of retailers that sell Fire Cider, the retailers' geographic scope, and that Shire City promotes Fire Cider for many uses, including as a salad dressing, in sauces and marinades, and as a mixer for alcoholic beverages. In addition, as part of its marketing campaign, Shire City educates people about what the product is and how it can be used because stores and consumers often do not know what Fire Cider is, and retailers are unsure of where to display Fire Cider.

**B.**     **Shire City's Process of Trademarking Fire Cider as a Dietary Supplement**

In 2012, Shire City was introduced to the idea of trademarking Fire Cider and hired a company to run a trademark conflict search on the term. (D. Ex. 277.) Based on the results, in April 2012, Shire City applied to register Fire Cider on the Principal Register as a dietary supplement. The registration issued on December 18, 2012; the registration lists the date of first use as December 4, 2010 (P. Ex. 21), which was the date of the holiday fair in Pittsfield where Shire City first sold Fire Cider. St. Pierre, Amy Huebner, and Brian Huebner all testified that, at the time they applied for the registration, they were not aware of anyone having superior rights to the term or of anyone else using the name fire cider or making products referred to as fire cider.[3]

---

[3] This testimony, however, is undermined by at least two documents. First is a business plan Shire City sent to an insurance company in February 2011. (D. Ex. 289.) The plan included a section about competition, which states: "At this time the Apothecary in Florence, MA is the only store near Berkshire County that we have found selling 'Fire Cider'. This is one of several hundred products they sell. We have not seen 'Fire Cider' for sale anywhere else." (*Id.* at P022225.) In response to questions about the business plan, Amy Huebner testified that someone had mentioned to her that the Apothecary sold a fire cider, she did not investigate whether that was true, but she wanted to disclose it to the insurance company out of an abundance of

**C.      Etsy Listings and the Ensuing Controversy, Including the Tradition Not Trademark and the Free Fire Cider Movements**

In late 2013, Brian Huebner searched for Shire City's Fire Cider on Google and discovered Etsy[4] postings selling non-Shire City fire cider. Some postings used Shire City's Fire Cider logo and label, as though the seller(s) had copied and pasted the logo and label onto their own products.[5] Not knowing what to do, Shire City hired counsel and then contacted Etsy through the website's process for notifying them of IP infringement. Shire City provided Etsy with a copy of its trademark registration for Fire Cider. Etsy then removed fire cider listings, including from sellers who were not using Plaintiff's label.

Shortly thereafter, in early 2014, Shire City, St. Pierre, and the Huebners received a flood of emails and social media posts with concerns and complaints about the Fire Cider trademark and the delisting of products on Etsy. They received emails from people in the herbalist community attacking Shire City's business and attacking St. Pierre and the Huebners personally. Shire City and Fire Cider previously had positive reviews on Facebook and Amazon, but their ratings plummeted in response to multiple negative reviews. Specifically, people reported that fire cider—a term attributed to herbalist Rosemary Gladstar as early as the 1970s or 1980s—refers to a traditional tonic

---

caution. She had no personal or direct knowledge of anyone other than Shire City selling fire cider before early 2014. Second is an online post Brian Huebner made on November 8, 2011 in response to an article about fire cider. (D. Ex. 267.) The article, published on www.grass-roots-press.com in October 2010, describes the benefits of fire cider and provides a recipe. In response, Brian Huebner commented, "Great article, great recipe! My sister and brother in law and I have been making our own blend of Fire Cider for a few months now (www.firecider.com) and we've gotten a great response from the local community." (*Id.* at DEF000058.)

In addition, in early December 2012 (after Shire City submitted its trademark application but before the registration issued), Shire City pitched Fire Cider to a retailer over email; a representative from the retailer responded, "I am familiar with Fire Cider, as I make it myself." (D. Ex. 263.)

[4] Etsy is an online marketplace that provides a platform for individuals and small businesses to sell a variety of products, with an emphasis on handmade items, to buyers around the world.

[5] Defendants are not accused of using Plaintiff's labels, and the Etsy sellers who allegedly used Plaintiff's labels are not parties to this case.

people have made for years. People sent Shire City photos of books with recipes for fire cider or photos of their own homemade versions. At first, St. Pierre and the Huebners tried responding to people individually, but they were overwhelmed with the volume of emails and social media posts they received. They eventually crafted form responses.

In January 2014, St. Pierre and the Huebners learned of the Free Fire Cider and the Trademark Not Tradition movements. Amy Huebner described the movements as efforts to flood the market with uses of the "fire cider" term to make it generic. The movements urged people to post Yelp reviews; blog about the tradition of fire cider; share fire cider recipes, particularly those attributing it to Gladstar; make fire cider and label the bottles "Free Fire Cider from Trademark Restriction"; boycott Shire City; and contact retailers that sold Fire Cider and, using talking points provided by Free Fire Cider's and/or Trademark Not Tradition's websites, ask them to take it off the shelves. (*See, e.g.*, P. Exs. 22, 35-36, 97, 118, 125.) Shire City subsequently saw an uptick in purportedly infringing products being offered for sale online.

Defendants Telkes and Blue Hastings co-founded the Free Fire Cider and Tradition Not Trademark movements with Gladstar (or, at the very least, Defendants Telkes and Blue Hastings were involved in the movements' early days, and both had administrative privileges on the movements' websites and social media accounts). Defendant Telkes considers herself a Free Fire Cider spokesperson. She and Defendant Blue Hastings edited and posted on the Free Fire Cider website and Facebook account, sent emails from Free Fire Cider's email address, and promoted the boycott of Plaintiff's products. Free Fire Cider's website, Twitter account, and Instagram account remain active. Defendants Telkes, Blue Hastings, and Langelier (who was involved with Free Fire Cider but to a lesser degree than Telkes and Blue Hastings) also set up and circulated a change.org petition to cancel Shire City's trademark. Defendant Blue Hastings subsequently initiated a

proceeding before the United States Patent and Trademark Office ("PTO") to cancel Plaintiff's registration of the Fire Cider mark. (The cancelation proceeding is discussed in Section II.E. below.)

In Shire City's emails to people concerned about its trademark, it made statements like:

- "'Fire Cider' is indeed a term from the world of folk medicine that predates our usage of it." (D. Ex. 244 at P003875 (Jan. 25, 2014 email).)

- "We all know there have been lots of folks for hundreds of years making their version [of fire cider], including our grammas." (D. Ex. 258 at P001942 (Jan. 27, 2014 email).)

- "While I am not an expert in the field, I can tell you that a copyright protects intellectual property, such as a song, computer program, or a book title (Rosemary Gladstar wisely copyrighted her writings starting in 1999). As I understand it, the concept of fire cider has so many varieties and variations that it would most likely not be able to be copyrighted. It is too nebulous and doesn't fit neatly into any legal 'box', and the tradition is too long and broad reaching. . . . A trademark protects a brand name, and in turn the specific recipe associated with that brand. Most importantly, it only protects that brand name within the confines of commerce, so you have to be selling a specific, distinguished commercial product. When we were approached by a legal professional . . . we were the only commercially available Fire Cider on the market, and trademark was the only form of legal protection available to us. That does not mean we were the only people making or selling this product, but web and government searches turned up only a variety of recipes, not a business and a specific product." (D. Ex. 252 at P012693 (Jan. 28, 2014 email).)

- "You want 'fire cider' available to everyone always and we agree with you! . . . How can we safeguard the traditional use of the phrase fire cider, while at the same time protecting the businesses we have all worked to build?" (D. Ex. 256 at P001922 (Jan. 27, 2014 email); *see also* D. Ex. 255 at P001916 (Jan. 28, 2014 email); D. Ex. 257 at P001920 (Jan. 28, 2014 email).)

- "We did trademark the name knowing that it was in use in the world of herbalists. We've never denied this, or attempted to hide this fact." (D. Ex. 243 at P003867 (Jan. 29, 2014 email).)

- "While I understand that fire cider is a traditional remedy, prior to our business, there was virtually zero mainstream demand." (D. Ex. 253 at P012696 (Feb. 19, 2014 email).)

- "Basically our TM restricts the use of the term Fire Cider in a commercial setting. It does not prevent anyone from talking about, teaching, writing about, [making] fire cider at home or selling on a small scale (ie [sic] not

commercial, anyone selling without a whole sale [sic] license can sell whatever they want under whatever name they choose.). Sellers on Etsy are in a grey area: they can make what they want in their home kitchen but Etsy is a nation[al] sales platform with national advertising, so we had to let the Etsy legal department know that a few listings were in violation of our TM." (D. Ex. 249 at P001459 (Mar. 10, 2014 email); *see also* D. Ex. 250 at P003069 (Mar. 14, 2014 email).)

- "The words Fire Cider may be considered generic to a few thousand herbalists but the other 313 million people in this country don't know what it is. I can tell you this because I have fi[r]st hand experience handing out samples of my Fire Cider to nearly a quarter of a million people—almost all of them think I'm handing out warm apple cider or moonshine. . . . Shire City Herbals . . . is committed to being the best representative of Fire Cider in the national commercial market." (D. Ex. 249 at P001458 (Mar. 11, 2014 email); *see also* D. Ex. 250 at P003069-70 (Mar. 14, 2014 email).)

- "[W]hile it is a traditional term (which is something we mention in the copy on every bottle), the Fire Cider we make is also a new thing. It is the first time anyone's sold a product with that name, quality, and ingredients on a commercial scale." (D. Ex. 254 at P012661 (May 9, 2014 email).)

- "The general name [fire cider] can still be used, however, if folks want to do this new thing, selling commercially, they just have to use a different name. And there are so many general/historic names: fire tonic, mater tonic, plague/plaque tonic, etc." (D. Ex. 265 at P000088 (Mar. 23, 2015 email).)

- "Fire Cider still is a traditional folk remedy, in fact every bottle we have sold says exactly that!" (D. Ex. 248 at P004132 (Aug. 3, 2015 email).)

- "Our mission is to spread awareness of using food as medicine. I've personally told thousands of people how to make Fire Cider. Buy ours, take a class, find a recipe and make your own, we are adding to the tradition! The idea we are taking something away from people is completely unfounded. We were the first to market commercially which further compliments and adds to the centuries old folk tradition of teaching, making, recipe sharing, etc. . . . In our experience, no one knows what we are offering them, most people think Fire Cider is moonshine or sweet cider. Its [sic] not a generic or descriptive term and its [sic] a new thing to the vast majority of people." (D. Ex. 248 at P004131 (Aug. 4, 2015 email).)

## D. Defendants, Rosemary Gladstar, and Other Fire Cider Producers

### 1. Defendant Telkes

Defendant Telkes is an herbalist outside of Austin, Texas. She owns Wildflower School of Botanical Medicine, Wildflowers & Weeds LLC, and several subsidiaries of and predecessors to

Wildflowers & Weeds. Her business is 90% herbal education and managing the school and 10% selling herbs, herbal products, and CSA shares. She last had a physical storefront in 2012.

Defendant Telkes first heard of fire cider in 1998 in Eugene, Oregon. She learned how to make it while attending an herb school in 2000. She makes fire cider with vinegar, horseradish, ginger, garlic, onion, chili, honey, and sometimes other ingredients. She calls it Texas Fire Cider and currently sells it through Wildflowers & Weeds. She began selling her fire cider in 2003 at community events, including farmers' markets, mostly in central Texas. She also began selling it wholesale, including to a co-op in Austin. And she listed it for sale in her catalogs. (D. Exs. 149, 169-75.) She never obtained a Texas food license, other approvals from Texas, or any FDA approval. She does not have records showing sales of fire cider from before 2004.[6] (D. Exs. 150-66.) Wildflowers & Weeds currently has two wholesale customers to which it sells Texas Fire Cider (both are in Austin), and it distributes Texas Fire Cider to its CSA members. The most fire cider Defendant Telkes has ever sold is approximately 20 units per year. For example, in 2010, she sold 22 units of Texas Fire Cider, which amounted to 0.5% of her sales that year. (P. Ex. 124.) She also teaches students how to make fire cider at the Wildflower School of Botanical Medicine and says it is one of the most popular recipes taught at the school.

According to Defendant Telkes—based on conversations with herbalists, reading herbal literature, and experiences in communities where people make fire cider—fire cider is a well-known remedy in the herbal community. Many people in Austin are familiar with it and make their own.

Defendant Telkes does not want to be associated with Plaintiff or its product. She has never heard of any consumer being confused between her Texas Fire Cider and Plaintiff's Fire Cider, and she does not want customers to confuse them.

---

[6] Defendant Telkes has an invoice from 2003 showing she gave away a free sample of fire cider. (D. Ex. 148.)

## 2. Defendant Blue Hastings

Defendant Blue Hastings is an herbalist who first heard of fire cider at an herb class between 1999 and 2003. She also came across fire cider in books and at herbal conferences, classes, Gladstar's herb school, and at a clinic in Tennessee. Defendant Blue Hastings makes her own fire cider with apple cider vinegar, ginger, horseradish, and hot pepper. She is the sole proprietor of Farmacy Herbs in Providence, Rhode Island, which she opened in August 2008. Farmacy Herbs sells fire cider—which is labeled as "fire cider"—in its storefront and at a farmers' market in Providence. Defendant Blue Hastings once posted fire cider for sale on Etsy, but she never sold any through that platform. She recommends fire cider to aid in digestion and soothe upper respiratory issues. Farmacy Herbs' fire cider consumers are people who use natural remedies, herbalists, local farmers, people who support women-owned businesses, and her friends. Farmacy Herbs does not have FDA approval, a Rhode Island food license or other Rhode Island approval, or lab testing for its fire cider. Defendant Blue Hastings contends she began selling fire cider in 2006, but she does not have sales records for the period from 2006 to sometime in 2008. In addition, after the case began, she threw away some sales records from 2008 to 2012. She does have other records from that period, which show some fire cider sales. (*See* D. Ex. 190 at DEF001535; D. Ex. 192; D. Ex. 193.)[7]

Farmacy Herbs makes other herbal products, including one called peppermint lip balm. (P. Ex. 111 at BLUE000004.) Defendant Blue Hastings chose that name because it describes what the product is. Fire cider is included in Farmacy Herbs' list of tinctures. (*Id.* at BLUE00005.) Defendant Blue Hastings testified she does not use that term to refer to a brand; rather, "fire cider" refers to a specific set of ingredients and to what the product is—like peppermint lip balm does. The name fire

---

[7] The court held a spoliation hearing on March 26 and 27, 2019. Based on the evidence and argument at the hearing, the court ruled an adverse inference against Defendant Blue Hastings was appropriate, meaning the court infers that the destroyed the records would not have shown any fire cider sales.

cider communicates that the product is a traditional herbal blend. In contrast to fire cider and peppermint lip balm, Defendant Blue Hastings has created names for other products, which do not describe what those products are (e.g., teas called Digest the Best, Dream Blend, and Unwind Your Mind; a salve called Belly Bump; and tinctures called Cranium Comfort and Less Stress). (*Id.* at BLUE000001-5.)

Defendant Blue Hastings does not want her fire cider to be associated with Plaintiff's Fire Cider. She does not know of any consumer who has been confused between hers and Plaintiff's.

### 3. Defendant Langelier

Defendant Langelier is an herbalist in Maine. She founded Herbal Revolution Farm & Apothecary LLC in the fall of 2009. Herbal Revolution makes and sells herbal products to 300-400 stores nationwide with a focus on the northeast and mid-Atlantic regions. It has a farm, greenhouse, drying facility, and manufacturing facility. Herbal Revolution also sells products to one distributor and directly to consumers online, but it does not have a storefront.

Defendant Langelier first learned about fire cider from farmers. She began selling fire cider in September 2013, when she debuted a product called Fire Cider No. 9. (D. Ex. 195.) Before she started selling it, she sent the product to a lab for microbial testing to ensure it was safe to sell, purchased bottles, and created a label. She included "No. 9" in the product name to indicate it was Herbal Revolution's version of fire cider and to reference fire stations being identified by numbers.

In the spring of 2014, Defendant Langelier met Brian Huebner at a trade show. They subsequently communicated online, and he asked her to remove "fire cider" from the name of her product. She agreed and changed the name to Fire Tonic No. 9. On the side of the new label, though, she included the following language: "FIRE TONIC NO. 9 (aka Fire Cider) is a traditional recipe passed down by herbalists, farmers and health practitioners and is known to support proper respiratory and digestive health. Today, we are happy to share our version of this timeless recipe

with you." (P. Ex. 101; D. Ex. 197.) She included the "(aka Fire Cider)" language because her consumers knew what fire cider was but did not know what fire tonic was, so she had to explain that Fire Tonic No. 9 is simply fire cider. In August 2014, Brian Huebner asked her to remove "(aka Fire Cider)" from the label. (P. Ex. 106.) She agreed, but Plaintiff brought this lawsuit against her before she changed the label, and she kept that language on the label until she rebranded her products in 2018. (D. Exs. 198-99.)

Defendant Langelier began selling Fire Tonic No. 9 to the Portland, Maine Whole Foods in 2014. Since 2017, she has sold it to co-ops, specialty food stores, cafes, juice bars, and national supermarket chains (one Hannaford supermarket in Portland, Whole Foods locations in the north Atlantic region, and MOM's Organic Market), as well as at fairs and farmers' markets. In addition, she has sold two orders of Fire Tonic No. 9 to HomeGoods. She also sells it on Herbal Revolution's website and on Amazon.

According to Defendant Langelier, fire cider is well-known in the herbalist community, and she knows farmers, landscapers, and fishermen who are familiar with it. She uses herbal remedies and medicines as food (and food as medicine), wants people to enjoy herbal remedies, and believes fire cider is delicious, depending on its formulation. People who buy Fire Tonic No. 9 care about health, wellness, and preventative care; they tend to take dietary supplements and vitamins. Fire Tonic No. 9 has multiple uses, including for preventative health benefits, as a salad dressing, in soups, on its own as a shot, and as a cocktail mixer. (P. Ex. 83.)

Defendant Langelier does not want Fire Tonic No. 9 or her business to be associated with Plaintiff or Fire Cider. She has never heard of anyone confusing her product with Plaintiff's.

### 4. Rosemary Gladstar

Rosemary Gladstar is an herbalist who lives and works in Vermont. In 1972, she started an herbal store in California. The next year, she started teaching herb classes, which grew until she

started an herb school in California in 1976. Beginning in 1981 and continuing to the present, Gladstar has offered a correspondence course (it is now offered online). In 1987, she moved to Vermont and founded the Sage Mountain Herbal Retreat Center, which offers classes in herbalism.

During the winter session of 1979-1980 at the California herb school, she taught a class to 35-40 students called Herbs for Winter Health in which she taught how to make a spicy, vinegar-based mixture with honey. She cannot remember who named the mixture—it might have been her or a student—but the name fire cider stuck. Fire cider was taught in the winter class every year at the California herb school and then every year at the Vermont school. Gladstar estimates she taught fire cider to 1,000-1,200 students in California and 2,800 students in Vermont. The correspondence course has always included a lesson for fire cider. She estimates 38,000 people have taken the correspondence course. Rosemary's Remedies is an online video series used in the correspondence course; it is currently available for free and includes a section on fire cider. There have been more than 226,000 views of the Rosemary's Remedies fire cider video. Gladstar has also taught people how to make fire cider at conferences, like the International Herb Symposium, attended by hundreds of people.[8] In addition to teaching, Gladstar has written eleven books, four of which include fire cider recipes.[9] She also sold fire cider in her herb store in California for 18 years. According to Gladstar, developing fire cider was a creative, group process, and the recipe and product were intended to be shared throughout the community.

Gladstar testified that fire cider and a product called cyclone cider are very similar or identical, but she believes her use of fire cider predated cyclone cider. She used a sell a third-party's

[8] While Gladstar was credible, the numbers she provided were merely estimates, and no documents were introduced at trial showing the numbers of students who have taken Gladstar's courses in which she teaches about fire cider.

[9] At least three of the books containing fire cider recipes were published before Shire City began making and selling Fire Cider: one was published in 2001 (D. Ex. 308), one was published in 2001 and again in 2008 (D. Ex. 314), and one was published in approximately 2003 (D. Ex. 11).

14

cyclone cider. She also testified that people have recently started calling it fire tonic, but she believes that it is to avoid Plaintiff's trademark.

She classified fire cider as a tonic for daily use to enhance health but agreed it can be used as a food. One of her books has a recipe for Fire Cider Zest, which is described as "[a] warming, energizing concoction" that "can be added to salad dressings, used to flavor steamed veggies, and sprinkled on steamed grains." (D. Ex. 308.) But, according to Gladstar, this zest is different from fire cider because it contains ginseng and ginger root.

Gladstar was a core member of the Free Fire Cider movement. In 2014, she had meetings with Defendants Blue Hastings and Telkes about the movement, she contributed to and posted on the movement's website, and she drafted materials that were disseminated to the movement's followers.

### 5. Other Fire Cider Producers

Monica Rude owns Desert Woman Botanicals in New Mexico. She began selling fire cider in 1999. (D. Ex. 213.) Rude uses the name fire cider for her product because that is the ordinary term to refer to it. She did not invent that name, but she has invented names for other products. She explained that cyclone cider is another name for fire cider, but fire cider is not another name for cyclone cider. According to Rude, fire cider is well-known within the herbalist community, but she has not come across it outside of that community. Initially, Rude's sales were local, either at farmers' markets or to friends. By the end of 1999, she was selling fire cider to stores in New Mexico and Arizona and on her website. In 2000, she sold fire cider in Texas, and she believes she sold it to a store in Massachusetts in 2001. She currently sells fire cider on the Desert Woman Botanicals website and to 20 stores, wholesalers, and practitioners in Florida, Massachusetts (*see, e.g.*, D. Ex. 208 (records showing sales to Massachusetts retailer in 2009 and 2011)), New Mexico, Texas, Washington, and Wisconsin. Rude created the Desert Woman Botanicals website in 1999, and fire

cider was one of the first products available on the site. Fire cider is still available on the website. (D. Exs. 217-20, 222 (screen shots of website showing fire cider).) Fire cider was listed on the front page of the Desert Woman Botanicals catalog in 2002. (D. Ex. 212.) The catalog describes it as "A Desert Woman Exclusive!" (*Id.*) Rude testified she used the word "exclusive" because, as far as she knew, she was the only one selling fire cider in her area. She handed out the catalog in stores where she sold products and included it with shipments. She estimates the catalog reached a few hundred people per year.

Greta De La Montagne is an herbalist in Bayside, California. She first learned about fire cider at a conference in 1994. In 1996, she started making fire cider in large batches and selling it. She sells fire cider at conferences, events, and farmers' markets. Her fire cider sales have been consistent over time. The label on her product says "fire cider." She described the term fire cider as referring to something specific, the way the terms pilsner and stout refer to specific types of beer. De La Montagne knows other people who sell fire cider; they all call it fire cider, except one company that calls it cyclone cider. She has mostly seen it sold in small-scale at festivals, famers' markets, and other events. Her experience with fire cider has been within the herbalist community.

Pamela Mitchell is an herbalist in Georgia who owns Karen's Botanicals, which she bought from its previous owner in 2011. Karen's Botanicals makes and sells fire cider; Karen's Botanicals labeled its product "fire cider" both before and after Mitchell bought the business. (D. Exs. 225-28 (showing fire cider listed for sale on Karen's Botanicals' website in 2006 through 2009).) In 2011, Karen's Botanicals sold fire cider on its own website, Etsy, Amazon, and eBay. Brian Huebner contacted Mitchell about her use of the term fire cider, so she took down all of Karen's Botanicals' fire cider listings, except on its own website. Her fire cider sales subsequently dropped. She described fire cider as a spicy and sweet tonic. She uses it as a salad dressing.

Crystal Davidson is an herbalist in Austin, Texas who first heard of fire cider in roughly 2003 when she went to Defendant Telkes' school. Davidson's knowledge of fire cider came from the herbalist community and herbal literature. In approximately 2006, Davidson began working for Defendant Telkes as an apprentice; she later became a full employee until she left in 2008. As an apprentice and employee for Defendant Telkes, Davidson made fire cider and sold it at farmers' markets, festivals, and events and to a co-op. Davidson now makes a line of herbal retail products and makes private label herbal products. She currently makes and sells fire cider.[10]

---

[10] Gladstar, Rude, De La Montagne, Mitchell, and Davidson testified at trial. The parties designated portions of other witnesses' depositions about the use and understanding of fire cider to be introduced at trial. (Dkt. No. 235.) Holly Poole Kavana is an herbalist in Washington D.C. who first learned to make fire cider when living in Oakland, California in 2005. (Dkt. No. 235-2.) In her experience, the term is common among herbalists to refer to vinegar infused with spicy herbs, like garlic, cayenne, ginger, and horseradish. The term is broad, and people often add other ingredients to make their own versions. She has met many people—both herbalists and not—who make and sell fire cider. She has seen it for sale at farmers' markets, craft stands, and co-ops. Poole Kavana described fire cider as a general name for a popular remedy. She distributed fire cider, in bottles labeled as "fire cider," to members of her CSA in the fall of 2010. Sheila Devitt is an herbalist in the Bay Area who first learned about fire cider when working in Albuquerque, New Mexico between 2000 and 2003. (Dkt. No. 235-3.) She worked in an herbal store that sold several retail versions of fire cider, including one called cyclone cider. The store also taught classes on how to make fire cider. In the winter of 2008, Devitt taught a fire cider class in San Francisco. She understands fire cider to refer to a traditional recipe using apple cider vinegar and warming herbs and spices, like garlic, ginger, horseradish, and cayenne. Natalie Wilson is an herbalist in Shorewood, Illinois who first learned about fire cider in roughly 2008 or 2009 within the herbal community and from Gladstar's books and videos. (Dkt. No. 235-4.) She began making it in 2010 or 2011 and began selling it in her shop in approximately 2013. According to Wilson, the term fire cider describes what the product is. In response to a request from Plaintiff, Wilson changed the name of her fire cider to Fire Shot, but her sales dropped; she thinks people did not recognize the product anymore. Almost all of Wilson's herbalist friends—she estimates hundreds of people—have made and sold fire cider. Michelle Blackburn lives in North San Juan, California. (Dkt. No. 235-5.) She has an online herbal business, and her primary focus is apple cider vinegar tonics. She first learned about fire cider when reading Gladstar's recipes in approximately 2008, began making it in approximately 2009, and began selling it through her business in approximately 2012. Fire cider is one of Blackburn's most popular products. According to Blackburn, every herbalist makes fire cider and has his or her own take on it. The term fire cider refers to a type of product that everyone knows. Blackburn originally called her product fire cider but changed it to Fire Cider Oxymel and then Dragon Cider to avoid issues with Plaintiff's trademark. When she called her product fire cider, she used that term as a product name, not as a brand name. Blackburn estimates she has seen at least 40 other people selling fire ciders at farmers' markets, herb conferences, and herbal stores.

**E.** **Trademark Cancelation Proceedings and Plaintiff's Subsequent Trademark Application**

In June 2014, Defendant Blue Hastings and others filed petitions with the Trademark Trial and Appeal Board ("TTAB") to cancel Plaintiff's registration of the Fire Cider trademark on the grounds that it is generic or merely descriptive. The TTAB suspended the cancelation proceedings pending the resolution of this lawsuit.

In April 2015, Plaintiff applied to register Fire Cider on the Principal Register as a mark for non-alcoholic beverages. Counsel for Defendants protested the registration. (D. Ex. 349.) A PTO examining attorney issued a non-final office action initially denying Plaintiff's application because the term is merely descriptive and appears to be generic. (D. Ex. 347.) The examining attorney gave Plaintiff the opportunity to submit evidence and arguments to support its application. (*Id.*) In response, Plaintiff requested the examining attorney suspend action on the application pending resolution of this lawsuit. (D. Ex. 348.) The examining attorney then suspended the application.

**F.** **Expert Opinions**

Three experts testified at trial regarding genericness: Defendants' expert Dr. Ronald Butters, Plaintiff's expert Robert Wallace, and Defendants' expert Mark Blumenthal, who rebutted Wallace's opinions.

**1.** **Dr. Ronald Butters**

Defendants' expert, Dr. Ronald Butters, is the former chair of the English Department and Linguistics Program at Duke University. He is an expert in linguistics, which he described as the study of historical, contemporary, and social uses of language. He is also an expert in lexicography, which is the creation of dictionaries.

For this case, he examined whether fire cider is generic among speakers of contemporary, American English. He looked at actual usage of the term within that population, which led him to conclude that the term began as a generic term and continued to be used generically. He ran

searches for examples of actual usage of the term fire cider in print using online tools like Google Books, subscription-based newspaper archives, and a database called ProQuest. Dr. Butters limited the temporal scope of his search to 1980 to 2017 and limited the geographic scope to the United States. His searches yielded 34 results, and Defendants' counsel provided him with a 35th source referring to fire cider. The earliest use of fire cider that Dr. Butters found was from 1997. (D. Ex. 306.) He described the materials that contained the term as being written by and for people who are particularly interested in herbal remedies and who have a highly specialized vocabulary. A large number of the results referred to fire cider using all lower case letters, which indicates generic usage to Dr. Butters. Some results capitalized the "F" and "C," but he opined those hits also used the term generically like, for example, in the name of a recipe. In addition, some hits used gendered pronouns to describe fire cider—e.g., "her fire cider"—which also indicates generic use.

The 35 uses of fire cider that Dr. Butters examined were in newspapers (small and medium-sized towns' papers (Dr. Butters did not provide evidence of these papers' circulations) and The New York Times), magazines, and books (cookbooks and how-to books). Twelve of the 35 predated Plaintiff's first sale of Fire Cider. According to Dr. Butters, those 12 reflected widespread use of the term in a generic context. Most appeared in the context of recipes and cooking classes. One hit is a 2002 article in the Albuquerque Journal about Monica Rude (discussed above), which states Rude's "most popular products" include "a general health tonic, aptly named 'Fire Cider' because of its apple cider vinegar and cayenne base." (D. Ex. 309.) Dr. Butters concluded this was a generic use of fire cider because there was no indication Rude was claiming to be the product's exclusive source or asserting that fire cider is a brand.[11] The other 11 results appeared on Rude's

---

[11] Dr. Butters gave this same analysis of Rude's use of the term fire cider on her Desert Woman Botanicals website. He included screen shots of her website in his expert report and was questioned about them on cross-examination. A different screen shot of her website was admitted into evidence. (D. Ex. 212.) That

website that sold fire cider in 2001 (D. Ex. 222), in books (D. Exs. 308, 311, 314), in an article in Body & Soul magazine published by Martha Stewart Living Omnimedia (D. Ex. 310), and in articles from newspapers across the country (D. Exs. 306 (Burlington, Vermont), 307 (Doylestown, Pennsylvania), 312 (Oakland, California), 313 (Austin, Texas), 315 (Memphis, Tennessee), 316 (Nashua, New Hampshire)).

Of the 23 results showing use of fire cider from after Plaintiff began selling Fire Cider, one is the New York Times article, which spotlights an actor who "[s]wears by" the "Fire Cider shot at Green Symphony, a cafe in midtown Manhattan" (D. Ex. 335); this fire cider shot was not attributed to Plaintiff. The actor also described "a family ginger tea recipe" containing "ginger, cayenne pepper, apple-cider vinegar, onion, garlic, oranges, lemon, and honey" that he did not identify as a recipe for fire cider (*Id.*) Most of the other results are newspaper articles about making fire cider at home or newspaper announcements about fire cider classes or demonstrations across the country. (D. Exs. 317 (Tallahassee, Florida), 318 (Danville, Kentucky), 319 (Stanford, Kentucky), 320 (Pittsburgh, Pennsylvania), 321 (Burlington, Vermont), 322 (Greenwood, South Carolina), 323 (Coshocton, Ohio), 324 (Asheville, North Carolina), 325 (Camden, New Jersey), 326 (Frederick, Maryland), 327 (Binghamton, New York), 328 (Hartford, Connecticut), 329 (Tallahassee, Florida), 330 (Cherry Hill, New Jersey), 331 (Cherry Hill, New Jersey), 332 (Binghamton, New York), 333 (Frederick, Maryland), 334 (Asbury Park, New Jersey).) The remaining four results are about Plaintiff's product. (D. Exs. 336-39.) One is a 2015 article in a Philadelphia newspaper about Plaintiff, St. Pierre, the Huebners, and Fire Cider. (D. Ex. 336.) Dr. Butters' report erroneously states the newspaper was local to Plaintiff's business and discounts the article as showing only local recognition of Plaintiff's brand. On cross-examination, Dr. Butters conceded the Philadelphia newspaper was not local to

version states: "Fire Cider – Hot! Sweet! Sour! A Desert Woman Exclusive!" (*Id.*) On cross-examination, Dr. Butters opined that Rude's use of "Exclusive!" was puffery that did not signify non-generic use.

Plaintiff's business but explained the paper was still regional and did not show that Plaintiff's brand is widely known throughout the country.

Dr. Butters did not find fire cider in any dictionary, which he described as a factor relevant to the determination of whether a word is generic. He gave several reasons for its absence from the dictionary: the term is relatively new, no dictionary can contain every word, dictionaries have limited resources for identifying new words to add, dictionaries are often wary of adding new words before they are tested, and dictionaries often add new words based on the outcome of litigation. On cross-examination, he acknowledged that a reason fire cider is not in the dictionary is because it is used by specialized subgroups within the broader population, so it is not used with enough frequency.

Dr. Butters did not search for alternate names for fire cider but agreed there could be alternatives like fire tonic, fire brew, master tonic, and cyclone cider. (P. Exs. 92, 102, 132-135.) He further explained that other generic terms—like tincture or oxymel—could accurately refer to fire cider, but that does not mean that fire cider is not also generic. He used motor vehicles as examples: motor vehicle, automobile, car, and truck are all generic and are broader than sedan, SUV, and sports car, which are also all generic. Applying the analogy to fire cider, tincture and oxymel are generic and are broader than fire cider, which is also generic.

## 2. Robert Wallace

Plaintiff retained Robert Wallace, a brand identity strategist. He has previously testified as an expert on genericness and consumer confusion; he has designed and implemented multiple consumer studies, including genericness studies.[12]

Wallace developed and conducted two online consumer surveys (one in 2015 and one in 2017) regarding awareness and understanding of fire cider within the general public. (P. Exs. 217,

---

[12] As an expert, Wallace has developed and conducted eight or nine consumer surveys and six or seven genericness surveys. As a brand strategist, he has developed and conducted more than 100 consumer surveys.

218.) The surveys are "Teflon surveys," which are a means for testing genericness.[13] Wallace's surveys presented a list of terms in a randomized order and asked participants if they were aware of those terms and whether a series of descriptors applied to some of the terms.

For the 2015 survey, the participants were 1,000 adults from across the United States. Participants were asked whether they were aware of the following terms: FIRE CIDER, HORNY GOAT WEED, GATORADE, GINKGO, MILK THISTLE, RAW PALMETTO, MAGNOLIA GRANDIFLORA, APPLE JUICE, GINGER ALE, APPLE AND EVE, and BOIRON. (P. Ex. 217.) Participants were then asked whether certain descriptors applied to FIRE CIDER, GATORADE, and MILK THISTLE. (*Id.*) Wallace testified that the descriptor question asked, "What are you?" Only 100 participants (10%) were aware of fire cider. Among those participants, there was a wide disparity in responses to the "What are you?" question. Wallace testified that there was no consensus of direction and no common awareness of function, and consumers chose contradictory descriptors. The survey also identified a subset of the population that, in Wallace's view, was highly predisposed to be aware of fire cider. Members of the subset were people who have ever used herbal remedies and/or homeopathic recipes; the subset contained 484 survey participants, 77 of whom (15.9% of the subset) were aware of fire cider. Even among this highly predisposed subset, there was no consistent view of what fire cider is, leading Wallace to conclude that the term is not generic. Based on the 2015 data, Wallace determined there was no common understanding of fire cider at all among anyone. As a result, he opined that fire cider is not generic among the general population or among the highly predisposed subset.

---

[13] A "Teflon survey" is "[t]he most widely used survey format to resolve a genericness challenge." 2 McCarthy on Trademarks & Unfair Competition § 12:16. "The name comes from a 1973 telephone survey used as evidence by a court to determine that TEFLON was a valid trademark, not a generic name for non-stick coating." *Id.*

Wallace conducted the 2017 survey to determine if perceptions changed due to the popularity of hard ciders and efforts by advocacy groups, like Free Fire Cider, to use the term generically. He included questions about whether participants believed fire cider was alcoholic and whether they had seen or heard about it online. The participants were 1,001 adults from across the United States. Only 61 participants (6.1%) were aware of fire cider. There were 467 people in the highly predisposed subset,[14] and of the subset, only 48 people (10.3% of the subset) were aware of fire cider. Based on this data, Wallace opined that the 2017 results mirror the 2015 results in that awareness of fire cider was low and there were great disparities in participants' understanding of the term, both within the general population and the highly predisposed subset. Due to the low awareness and lack of common understanding, he concluded fire cider is not generic.

When assessing the weight to give Wallace's survey results, the court considers whether the correct population was surveyed. Courts give limited weight to genericness surveys that sample the wrong population or exclude them outright. *See J & J Snack Foods, Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 371-72 (D.N.J. 2002) (court excluded survey where respondents were not actual or likely buyers of product); *Lifeguard Licensing Corp. v. Kozak*, No. 15 Civ. 8459 (LGS) (JCF), 2017 WL 908199, at *5 (S.D.N.Y. Mar. 7, 2017) (party challenged consumer survey on ground that its subjects did not mimic relevant public; court found survey admissible and deficiencies went to its weight, but cautioned that relevant public may be smaller than adult American population for product that is not mass-marketed); *Int'l Watchman, Inc. v. NATO Strap Co.*, No. 1:13 CV 1986, 2014 WL 12600471, at *1-*2 (N.D. Ohio Dec. 19, 2014) (court held survey whose respondents were members of general public was admissible, and defendant could challenge the relevant universe through cross-

---

[14] To ascertain the highly predisposed subset, the 2017 study asked whether participants had ever used herbal remedies and/or homemade health recipes. (P. Ex. 218.) The 2015 study, on the other hand, asked whether participants had ever used herbal remedies and/or homeopathic recipes. (P. Ex. 217.)

examination).[15] The court discounts the relevance of Wallace's surveys because they sampled the entire adult population in the United States, and that group is much broader than the relevant purchasing public. *See Magic Wand, Inc. v. RDB, Inc.*, 940 F.2d 638, 641 (Fed. Cir. 1991) (relevant purchasing public is comprised of "actual or potential purchasers of the goods or services"). Given the nature of the product, the relevant purchasing public is a more limited group than the entire adult population. Even though Plaintiff sells Fire Cider in all 50 states and in a variety of channels of trade, Plaintiff has not demonstrated that the entire population is likely to buy Fire Cider. The fact that Fire Cider is one of many products stocked in a mass-market grocery store or available through a popular website does not mean that all customers who shop at that store or on that website are people who might consider purchasing Fire Cider. Because the 2015 and 2017 surveys sampled an overbroad population, they have limited, if any, probative value. *See Koninkijke Philips Elecs. N.V. v. Hunt Control Sys., Inc.*, No. 11-3684 (SRC) (CLW), 2016 WL 3545529, at *5 (D.N.J. June 29, 2016 ("Surveys 'of the wrong universe will be of little probative value in litigation,' and the party offering the survey bears the burden to show that the universe of the survey is proper.") (quoting *Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 119 (3d Cir. 2004)); *J & J Snack Foods*, 220 F. Supp. 2d at 371 ("It is clear that 'the closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results.'") (quoting 5 McCarthy on Trademarks & Unfair Competition § 32:163). Even the highly predisposed subsets are not particularly probative because Plaintiff has not established that the

---

[15] Similarly, the court in *Kournikova v. Gen. Media Commc'ns, Inc.* excluded a consumer survey with an overbroad universe of respondents that did not approximate average consumers of the product. 278 F. Supp. 2d 1111 (C.D. Cal. 2003). *Kournikova* is not a genericness case but is instructive because the court examined the probative value of a consumer awareness survey. In that case, the plaintiff, a famous tennis player, alleged the defendant published in *Penthouse* magazine photographs of semi-nude women falsely identified as the plaintiff. *Id.* at 1113. The plaintiff conducted a survey to discern whether consumers would believe she had voluntarily associated with *Penthouse*. *Id.* at 1124-25. The survey sampled the general public, but less than 10% of the sample had recently purchased *Penthouse*, and less than 25% had purchased *Playboy*. *Id.* at 1125. The court found the survey should have sampled the average *Penthouse* consumer. *Id.*

criteria used to select the highly predisposed subsets actually approximate the relevant purchasing public.

### 3. Mark Blumenthal

Defendants' second expert, Mark Blumenthal, is an herbalist, the founder and executive director of the American Botanical Council, and the editor of a periodical called *HerbalGram*. He is also an editor of *The ABC Clinical Guide to Herbs*, a multi-edition book of clinical research for medical professionals. Blumenthal was retained to respond to Wallace's consumer surveys. He has no training in conducting surveys and is not an expert in statistics; his expertise is in buying and market trends for herbal supplements. He also conceded he did not review the hard data underlying Wallace's conclusions and had no experience with quantitative market research before this case.

Blumenthal opined that the subject populations of Wallace's surveys were too broad because the herbal products market, especially for products like Fire Cider, is much smaller than the general adult population. Because the court already concluded Wallace's surveys have limited probative value, some of Blumenthal's specific criticisms of the surveys are not relevant. However, his opinions on the size of the herbal dietary supplement market, the relevant channels of trade, and core versus peripheral shoppers are relevant to assessing the scope of the relevant purchasing public.

First, Fire Cider is registered on the Principal Register as a dietary supplement. Blumenthal testified there are many types of dietary supplements, including vitamins, minerals, fish oil, and herbal supplements. Herbal supplements are made from plant materials like roots, leaves, flowers, stems, barks, and their extracts. As of October 2017, approximately 76% of Americans have used a dietary supplement. Approximately 18-19% of that 76% have used herbal dietary supplements, which equals approximately 15% of the United States population. Herbal supplements can be made from a single herb or multiple herbs. Single-herb supplements make up approximately 60% of the herbal supplement market, and multi-herb supplements make up approximately 40%. Approximately

6% of the United States population uses multi-herb supplements. Liquid herbal supplements are less popular than solid dose supplements (e.g., capsules, pills, etc.) because of the bitter, acrid taste of liquid supplements and due to convenience. Only approximately 4% of the United States population uses liquid herbal supplements. Fire Cider is a liquid, multi-herb supplement, so—according to Blumenthal—a maximum of only 4% of the population is likely to use it or products like it. Blumenthal contends products like Fire Cider do not have mass market appeal because they do not taste good. His analysis is limited in two ways. First, it depends on his having considered Fire Cider solely as a dietary supplement and not for other purposes. Second, he did not consider any market other than the supplement market or who else—other than supplement consumers—may use Fire Cider for purposes other than as a dietary supplement.

Second, as to channels of trade, herbal supplements are most often sold in health and natural food stores, via mail order, online, to trade professionals (e.g., physicians and acupuncturists), and, to a lesser extent, in the mass market. Most herbal supplements are manufactured by contractors who make products sold under different companies' labels. Many manufacturers make single-dose tablets but very few make liquid supplements. To Blumenthal, this suggests an overwhelming consumer preference for solid dose supplements. On cross-examination, he conceded he assumed Plaintiff's channels of trade are natural food stores, mail order, online, and some mass market stores, but he did not research where Fire Cider is sold other than to look at Plaintiff's website. In addition, as of the time he wrote his report, he did not know where Plaintiff sold Fire Cider.

Third, Blumenthal described core shoppers as people with a strong commitment to natural, organic, and non-GMO products who use herbs as medication and who shop in natural food stores. Peripheral shoppers buy the same products as core shoppers but are less committed to them. Blumenthal critiqued Wallace's surveys for not addressing the distinction between core and peripheral shoppers, and the distinction matters because, according to Blumenthal, core shoppers

26

are the primary consumers of any fire cider. But he acknowledged that mass market stores, like grocery stores, are beginning to stock items core shoppers buy that used to be sold only in natural or health food stores. He further acknowledged that mass market stores reach more people than natural food stores, which means more people are exposed to the products in mass market stores, which in turn increases the scope of the purchasing public.

Blumenthal personally knows Defendant Telkes and Gladstar. Defendant Telkes volunteered for the American Botanical Council before becoming an employee there, and she now rents space from the Council to run her business. Blumenthal first met Gladstar in 1976 when he was an early distributor of her teas. He also created an award for Gladstar for her work in bringing herbalists together. Blumenthal testified he learned about this lawsuit in 2016 and heard it had ruffled herbalists' feathers; he also spoke with Defendant Telkes about Plaintiff's trademark.[16]

### III.     CONCLUSIONS OF LAW

#### A.     Counts 1, 2, & 5 and Counterclaim Count 1

The threshold issue is whether Fire Cider is generic. Genericism is core to Count 1 and Counterclaim Count 1, which both seek declaratory judgment regarding the mark's validity. If Fire Cider is generic, then the mark is invalid, and Plaintiff's claims in Counts 2 and 5 (Trademark

---

[16] In February 2014, Defendant Telkes emailed Blumenthal asking if the American Botanical Council and *HerbalGram* would publish an article about the Free Fire Cider movement. (P. Ex. 128.) Blumenthal does not recall receiving Telkes' email or whether he responded. Gladstar informed Defendant Telkes that she too would reach out to Blumenthal about helping with the movement. (*Id.*)

Infringement (15 U.S.C. § 1114(1)) and Massachusetts Common Law Trademark Infringement, respectively[17]) also fail because liability on those counts depends on whether Fire Cider is generic.[18]

### 1. Trademark Validity

The legal framework for assessing trademark validity is set forth in the court's summary judgment opinion and order. (Dkt. No. 181.) Because that framework is necessary for assessing the trial evidence, the court revisits it here.

"A mark is entitled to trademark protection if it is capable of functioning as a source-identifier of goods." *Boston Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 12 (1st Cir. 2008). A proposed mark must be distinctive. *See id.* at 12 n.9. There is "a spectrum of distinctiveness, based on [a proposed mark's] capacity to serve such a source-identifying function": "(1) generic (least distinctive), (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful (most distinctive)." *Id.* at 12 (citation omitted). The more distinctive a term is, the more likely it is to receive trademark protection. *Colt Defense LLC v. Bushmaster Firearms, Inc.*, 486 F.3d 701, 705 (1st Cir. 2007). Only the two least distinctive categories are relevant here.

Descriptive marks "convey[] an immediate idea of the ingredients, qualities or characteristics of the goods to which they are attached." *Boston Duck Tours*, 531 F.3d at 13 (internal quotation marks and citation omitted). A descriptive mark is not inherently capable of serving as a source-identifier. *Id.* A descriptive term can be protected "only if it has acquired 'secondary meaning' by which consumers associate it with a particular producer or source." *Boston Beer Co. v. Slesar Bros. Brewing Co.*,

---

[17] "[T]he common law of trademark infringement is essentially the same as that under the Lanham Act. Massachusetts trademark law, like the Lanham Act, requires Plaintiff to plead an entitlement to trademark protection because of the distinctiveness of its mark and a likelihood of confusion from Defendant's allegedly infringing use." *Boston Granite Exch., Inc. v. Greater Boston Granite, LLC*, No. 11-CV-11898-JLT, 2012 WL 3776449, at *5 (D. Mass. Aug. 29, 2012).

[18] The resolutions of Counts 3 and 6 (false designation of origin (15 U.S.C. § 1125(a) and common law unfair competition, respectively) also ultimately hinge on whether Fire Cider is generic. But because they require an additional step in their analyses, they are addressed separately below.

9 F.3d 175, 180 (1st Cir. 1993). A term acquires secondary meaning when "a significant quantity of the consuming public understand [the] name as referring exclusively to the appropriate party." *President & Trustees of Colby Coll. v. Colby Coll.-N.H.*, 508 F.2d 804, 807 (1st Cir. 1975).

A term is generic if it "designates the class, or 'genus[,]' of goods." *Boston Duck Tours*, 531 F.3d at 13-14. A generic term explains "what are you?" but does not answer the question "where do you come from?" *Id.* at 14 (citation omitted). Such a term "does not distinguish the goods of one producer from the goods of others." *Colt Defense*, 486 F.3d at 705 (internal quotation marks and citation omitted). Because a generic term describes a product, rather than identify the product's source, a generic term cannot become a trademark for the product it describes. *See Boston Duck Tours*, 531 F.3d at 14.

"Where, as here, the party claiming infringement has registered the term on the Principal Register, the registration establishes a rebuttable presumption that the term is not generic," which "may be overcome where the alleged infringer demonstrates genericness by a preponderance of the evidence." *Colt Defense*, 486 F.3d at 705 (citations omitted); *see also* 15 U.S.C. § 1115(a) ("[R]egistration . . . on the principal register . . . shall be prima facie evidence of the validity of the registered mark . . . "). "For a term to be generic . . . its 'primary significance . . . to the relevant public' must be to identify the nature of a good, rather than its source." *Colt Defense*, 486 F.3d at 705 (citations omitted); *see also Boston Duck Tours*, 531 F.3d at 18 ("The touchstone of the analysis remains the phrase's primary significance to the relevant public."). A term can be generic "in one of two ways. First, an invented name may become genericized; that is, the term began life as a coined term but became generic through common usage. Second, a term may be generic if it was commonly used prior to its association with the specific products at issue." *Hasbro, Inc. v. MGA Entm't, Inc.*, 497 F. Supp. 2d 337, 341-42 (D.R.I. 2007) (internal quotation marks and citations omitted).

### 2.    Application

Because Fire Cider is registered on the Principal Register, Defendants have the burden of rebutting the presumption that Fire Cider is not generic. *See Colt Defense*, 486 F.3d at 705. The first step in the genericness analysis is determining the scope of the relevant purchasing public. The second step is assessing the primary significance of Fire Cider to that group.

### i.    Relevant Purchasing Public

The relevant purchasing public is comprised of "actual or potential purchasers of the goods or services." *Magic Wand*, 940 F.2d at 641; *see also Re v. Smith*, No. Civ. A. 04-11385-RGS, 2005 WL 1140769, at *3 (D. Mass. May 11, 2005) (genericness is "determined by consideration of the relevant public who purchases or may purchase the [trademarked] goods in the marketplace") (internal quotation marks and citation omitted). The relevant public includes "'a usual buyer or other relevant members of the public' such as retail consumers in the parties' domestic markets." *CG Roxane LLC v. Fiji Water Co. LLC*, 569 F. Supp. 2d 1019, 1028 (N.D. Cal. 2008) (quoting *H. Marvin Ginn Corp. v. Int'l Ass'n of Fire Chiefs, Inc.*, 782 F.2d 987, 989 (Fed. Cir. 1986)). However, "[s]ometimes, the relevant public will not be the potential purchasing public as a whole but rather 'a relatively small group of highly trained and knowledgeable customers.'" *Colt Defense*, 486 F.3d at 709 (quoting *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 406 (6th Cir. 2002) (considering "relevant public" to be "participants in the semiconductor industry including manufacturers, customers, suppliers, vendors and the trade and technical press")).

The scope of the relevant purchasing public is a central and contested issue in this case. The parties presented competing evidence about how to define the relevant purchasing public. To resolve the dispute, it is helpful to examine how other courts have approached the task.

The Seventh Circuit addressed the issue in its pattern jury instructions: "The consuming public consists of people who may buy or use, or consider buying or using, the product or similar

products." *See* Federal Civil Jury Instructions of the Seventh Circuit, Instruction No. 13.1.2.2.5, *available at* http://www.ca7.uscourts.gov/pattern-jury-instructions/7th_cir_civil_instructions.pdf.

In *Colt Defense*, the First Circuit considered the relevant purchasing public of a type of firearm. 486 F.3d at 703. The issue was whether the military, which was under contract to purchase the firearm exclusively from the plaintiff, was part of the relevant purchasing public such that its understanding of the name of the firearm should be considered. The court concluded the military was part of the relevant purchasing public, and there was no legal principle precluding consideration of the military's understanding. *Id.* at 708-09.

Turning to district court cases, *Asociación de Industriales de Puerto Rico v. MarketNext, Inc.* involved the name of a magazine published by a trade association that represented Puerto Rican businesses in the manufacturing and services sectors. No. 09-1122(JAF), 2009 WL 793619 (D.P.R. Mar. 23, 2009). The court determined the relevant public was "potential advertisers and readers interested in doing business in, or engaging in commerce with, Puerto Rico." *Id.* at *7.

*Sea-Roy Corp. v. Parts R Parts, Inc.* involved construction equipment known as a trench compaction roller. No. 1:94CV00059, 1997 WL 1046282, at *1 (M.D.N.C. Dec. 2, 1997). The court determined the relevant public was actual or potential buyers or renters of trench compaction equipment. *Id.* at *31. The court explained how defining the relevant public this way facilitates the genericness determination: "[I]f purchasers of trench compaction equipment walk into retail stores or rental establishments and ask for a 'RAMMAX' and mean any brand of trench compaction roller (including Bomag, Wacker, Stone, etc.) and not specifically a RAMMAX roller manufactured by Rammax Maschinenbau, then Plaintiffs would meet their burden of showing genericness." *Id.* at *29.

These cases and the pattern jury instructions demonstrate that the relevant purchasing public must approximate actual or likely users of a product, and for products made for or marketed to specific or specialized consumers, that group is smaller than the entire adult population.

Defendants, substantially relying on Blumenthal, contend the relevant purchasing public is limited to herbalists and people who use liquid, multi-herb dietary supplements. But this group is too narrow.[19] Plaintiff's point that Blumenthal failed to consider Fire Cider's alternate uses is well taken. Purchasers interested in using Fire Cider as a salad dressing, marinade, cocktail ingredient, or for some other purpose broaden the scope of the relevant purchasing public beyond only herbalists and people who buy liquid, multi-herb dietary supplements, but not so far as to include the entire adult population.

Determining the scope of the relevant public here is resolved by reviewing the two ways a term can be generic: an invented term may become genericized or a term may be generic if it was commonly used before it was associated with a particular product at issue. *See Hasbro*, 497 F. Supp. 2d at 341-42. Defendants assert fire cider has always been generic. Plaintiff concedes the term is generic within the herbalist community but asserts that the relevant purchasing public is a broader group, and the term is not generic outside the herbalist community. Plaintiff also argues Defendants have tried to genericize the term within the broader population. The parties' conflicting arguments reflect a dispute with respect to when the relevant purchasing public should be measured. Timing is important because if the term was generic to the relevant public when Plaintiff began selling Fire

[19] The Federal Circuit has adopted a genericness test that looks first at the at the genus of the relevant good before determining the primary significance of the term to the relevant purchasing public of that genus of goods. *See, e.g.*, *H. Marvin Ginn Corp.*, 782 F.2d at 990. The court has not found any First Circuit case adopting the test, so it is not binding precedent, and neither party advocates using the Federal Circuit's test in this case. *But see Pub. Impact, LLC v. Boston Consulting Grp., Inc.*, 169 F. Supp. 3d 278, 287 (D. Mass. 2016) (approvingly citing Federal Circuit's test). The Federal Circuit's test is a sound method for ascertaining the scope of the relevant purchasing public, but neither party presented evidence related to the public that purchases the genus of goods to which Fire Cider belongs or that specific group's understanding of the term. Accordingly, it does not make sense to apply the Federal Circuit's test here. Nevertheless, the first step of that test is helpful for assessing the parties' arguments about the scope of the relevant purchasing public. The relevant genus is determined by looking at the category of goods for which the mark holder applied to register the mark on the Principal Register. *See In re Cordua Rests., Inc.*, 823 F.3d 594, 601-02 (Fed. Cir. 2016). Plaintiff registered Fire Cider as a dietary supplement drink. (P. Ex. 21.) Considering that genus, the relevant purchasing public is smaller than the entire adult population but larger than only herbalists and purchasers of liquid, multi-herb supplements.

Cider and registered the mark, then the term cannot become distinctive and cannot be a trademark. *See Boston Duck Tours*, 531 F.3d at 14 ("Because they serve primarily to describe products rather than identify their sources, generic terms are incapable of becoming trademarks . . . "). Defendants have proven that when Plaintiff applied to register its mark in April 2012 (and even when Plaintiff first sold Fire Cider in December 2010), the relevant purchasing public was herbalists, dietary supplement consumers, and the small group of consumers interested in fire ciders for other purposes. The evidence indicates the group of people using or interested in fire ciders for food or other, non-traditional purposes in 2010 to 2012 is small. Plaintiff's subsequent success marketing its product and selling it in mass-market stores does not alter the scope of the relevant purchasing public at the time they first began selling it or applied for registration. The relevant purchasing public's collective understanding of "fire cider" determines whether it is generic.

### ii.    Primary Significance of "Fire Cider"

A term is generic if "its primary significance . . . to the relevant public [is] to identify the nature of the good, rather than its source." *Colt Defense*, 531 F.3d at 705 (internal quotation marks and citations omitted). "[E]vidence of the relevant public's understanding of a term" may be "obtained from any competent source," such as "consumer surveys, the use of the term in media publications, use of the term by competitors in the industry, purchaser testimony concerning the term, and the plaintiff's use of the term." *Id.* at 706 (internal citations omitted); *see also Boston Duck Tours*, 531 F.3d at 18-20 (in assessing genericness of "duck tour," district court relied exclusively on dictionary definitions of "duck" and "tour" separately and erred in failing to consider use of "duck tour" in media, use of "duck tour" by other companies around the country, and plaintiff's own generic use of "duck tour").

To rebut the presumption that Fire Cider is distinctive, Defendants presented evidence of generic uses of the term in the media and by competitors, consumers, and Shire City itself. They did

not produce a consumer survey, but surveys, while "desirable," are not required. *Colt Defense*, 486
F.3d at 706 n.4 (citation omitted); *see also Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112,
118 n.4 (1st Cir. 2006) ("The absence of reliable survey evidence is not, in and of itself, dispositive
when a putative infringer attempts to establish that a registered mark is not entitled to protection on
[genericness] grounds. . . . The preferred form of proof includes direct evidence (such as consumer
surveys) suggesting that the average purchaser actually regards the mark as [generic]. Direct evidence
is not, however, an absolute prerequisite.") (internal citations omitted). In the absence of a consumer
survey from Defendants, the court considers Defendants' other evidence of genericness. Taking that
evidence together, Defendants have proven fire cider was generic at the time Plaintiff first sold it,
and when Plaintiff applied to register the mark, and necessarily remains so today.

First, Dr. Butters located uses of fire cider in the media as early as 1997. His searches yielded
a low number of results, but a third of them predated Plaintiff's use of the term. The pre-Shire City
uses were mostly found in newspapers in California, New Hampshire, New Mexico, Pennsylvania,
Tennessee, Texas, and Vermont, which shows use of the term was not limited to a small, geographic
region. Every early use of fire cider was generic, and they appeared in general interest publications
that did not specifically target the herbalist community. As a result, people who learned about fire
cider from these publications were not necessarily herbalists, and they learned about the term in a
generic context. Even the media references from after Plaintiff began making Fire Cider tend to
show generic use of the term. In particular, there were 18 generic references to homemade fire cider,
recipes, classes, and demonstrations. These too were published in newspapers from across the
country. One reference—the New York Times article—described commercial sales of fire cider in
Manhattan that were not attributed to Plaintiff's product. And only four of the media references that

Dr. Butters found were about Plaintiff's Fire Cider.[20] On the whole, media references to fire cider are generic.

Second, Plaintiff's competitors' uses of the term are all generic. The evidence showed commercial uses of fire cider beginning in the late 1990s, all of which described what the product was and did not identify it as a brand. These competitors are herbalists, most of whom learned about fire cider from Gladstar or her students. They sell fire cider at a smaller scale than Plaintiff, but they are nonetheless Plaintiff's competitors. This is especially true of Defendant Langelier because she and Plaintiff both sell their fire ciders in MOM's Organic Market. There is no doubt that fire cider is generic within the herbalist community. The term originated within that community, and Defendants presented ample evidence of generic use of the term within that community from long before Plaintiff began selling Fire Cider in 2010. It is true that "evidence of generic use by [a] small part of the relevant purchasing public has limited probative value." *Magic Wand*, 940 F.2d at 641. But herbalists are not merely a small part of the relevant purchasing public of fire cider. They were the primary purchasers when Plaintiff began selling its product, and their community first developed the product, so their use of the term fire cider is highly relevant. *See Colt Defense*, 486 F.3d at 709 ("Sometimes, the relevant public will . . . [be] a relatively small group of highly trained and knowledgeable customers.") (internal quotation marks and citation omitted).

---

[20] Plaintiff introduced evidence of other media references specifically related to its Fire Cider. (*See, e.g.*, P. Exs. 45 (2015 prevention.com article), 46 (2016 vogue.com article), 47 (2016 townandcountrymag.com article), 48 (2017 lucire.com article), 49 (2013 coolhunting.com article), 50 (2013 livingmaxwell.com article), 51 (2016 livingmaxwell.com video), 52 (2016 episode of The Doctors television show), 53 & 54 (2017 Smokey Goodness barbeque videos on YouTube), 55 (2018 New York Post article), 56 (2017 Politico article referencing an article in the Berkshire Eagle), 57 (2017 wamc.org Northeast Public Radio article), 58 (2016 wamc.org Northeast Public Radio article), 60 & 61 (2017 bevnet.com articles), 62 (2017 winsightgrocerybusiness.com article) 63 (2017 wholefoodsmagazine.com article).) These show non-generic use of the term and specifically attribute it to Plaintiff's product. However, these references are recent and, consequently, are not relevant to whether fire cider was generic at the time Plaintiff began making its product and applied to register the mark.

Third, the documentary evidence shows consumers used the term generically. For example, in response to a pitch from Shire City in December 2012, a representative from a retailer responded: "I am familiar with Fire Cider, as I make it myself." (D. Ex. 263.)

Fourth, since 2014, Plaintiff has used the term generically and has repeatedly recognized fire cider's tradition. St. Pierre and the Huebners might not have known the extent of fire cider's history when they started selling their product, but their lack of knowledge does not make the term distinctive.

An additional point is worth addressing. Plaintiff argues the existence of adequate alternative names for Fire Cider, like fire tonic or cyclone cider, supports its exclusive trademark right to Fire Cider. *Cf. Boston Duck Tours*, 531 F.3d at 20-21 (due to lack of adequate alternative names, "duck tours" was generic). However, "[t]here is usually no one, single and exclusive name for a product. Any product may have many generic designations. Any one of those is incapable of trademark significance [and] [a]ll of the generic names for a product belong in the public domain." 2 McCarthy on Trademarks & Unfair Competition § 12:9 (internal quotation marks, citation, and emphasis omitted). Examples include: car and automobile, sofa and couch, dresser and bureau. As a result, the existence of other, generic names does not mean Fire Cider is not generic.

Because fire cider is generic, Defendants are entitled to judgment on Count 1 and Counterclaim Count 1. They are also entitled to judgment on Counts 2 and 5.

## B.     Count 3: False Designation of Origin

In Count 3, Plaintiff asserts a claim for false designation of origin in violation of 15 U.S.C. § 1125(a). That provision of the Lanham Act prohibits the use of "any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin" that "is likely to cause confusion, or to cause mistake, or to deceive as to the . . . origin, sponsorship, or approval" of goods by another person. *Id.* at § 1125(a)(1)(A). However, it is a long-standing principle that "[u]nder no

circumstances is a generic term susceptible of de jure protection under s 43(a) of the Lanham Act, 15 U.S.C. s 1125(a) [(prohibiting false designation of origin)] . . . " *Miller Brewing Co. v. Falstaff Brewing Corp.*, 655 F.2d 5, 7 (1st Cir. 1981). Moreover, any confusion does not make a generic "term any less generic." *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1321 (11th Cir. 2012) (citing *Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 801 (11th Cir. 2003) ("[C]onfusion . . . is irrelevant unless the mark is protectible in the first instance."); *Boston Duck Tours*, 531 F.3d at 21 ("[T]rademark law . . . is not intended to prevent confusion between two similar, generic marks.")). As a result, Plaintiff cannot prevail on its false designation of origin claim.

## C.    Count 6: Common Law Unfair Competition

In Count 6, Plaintiff claims Defendants' promotion, distribution, and/or sales of their fire ciders in connection with Plaintiff's mark constitutes unfair competition under Massachusetts common law. "[U]nder Massachusetts law a plaintiff claiming unfair competition may show either 'palming off' or that the features of the product in question have acquired a secondary meaning such that confusion as to its source is likely to arise if defendant is allowed to copy them." *Pic Design Corp. v. Bearings Specialty Co.*, 436 F.2d 804, 807 (1st Cir. 1971).

"Palming off" is "an attempt by one person to induce customers to believe that his products are actually those of another." *Kazmaier v. Wooten*, 761 F.2d 46, 52 (1st Cir. 1985) (internal quotation marks and citation omitted). Plaintiff has not established any Defendant palmed off her fire cider product for Plaintiff's. None of Defendants' labels look like Plaintiff's, there is no evidence any Defendant attempted to associate with Shire City or its Fire Cider, Defendants testified they do not want to be associated with Shire City, and Defendants engaged in a campaign to distinguish Shire City from traditional herbalists.

The question, then, is whether Fire Cider has acquired secondary meaning such that Defendants' fire ciders are likely to create confusion. *See Polo Fashions, Inc. v. Branded Apparel*

*Merchandising, Inc.*, 592 F. Supp. 648, 652 (D. Mass. 1984) ("[Under Massachusetts law, the] essential element of a claim of unfair competition is thus the same as that for the infringement or false designation of origin claim: the plaintiff must prove the likelihood of consumer confusion.") (citation omitted); *see also Santander Consumer USA Inc. v. Walsh*, 762 F. Supp. 2d 217, 225 (D. Mass. 2010) ("The same likelihood of confusion standard applies to the unfair competition and false designation of origin claims."). Plaintiff cannot succeed on its unfair competition claim for the same reason it cannot succeed its false designation of origin claim: fire cider is generic, and "no amount of secondary meaning will entitle a generic term to protection." *Purolator, Inc. v. EFRA Distribs., Inc.*, 687 F.2d 554, 562 (1st Cir. 1982); *see also Miller Brewing*, 655 F.2d at 7 ("Under no circumstances is a generic term susceptible of de jure protection . . . under the law of unfair competition."); *Lyons v. Am. Coll. of Veterinary Sports Med. & Rehab., Inc.*, 997 F. Supp. 2d 92, 108 (D. Mass. 2014) (plaintiff must prove mark's distinctiveness to succeed on unfair competition claim). Consequently, Fire Cider cannot acquire secondary meaning such that there is confusion due to Defendants' use of the term.

**D.      Counterclaim Count 2: Mass. Gen. Laws ch. 93A**

Defendants also brought a counterclaim against Plaintiff for unfair and deceptive acts or practices in violation of Massachusetts' consumer protection statute, Mass. Gen. Laws ch. 93A. Defendants presented evidence that Plaintiff learned about the history of fire cider before initiating this lawsuit; in an email to a former Shire City customer, Amy Huebner stated, "Our lawsuit is not primarily about the trademark, it's about the unfair and deceptive business practices of the 3 folks named in it." (D. Ex. 268); the PTO initially denied Plaintiff's second trademark application for Fire Cider as a non-alcoholic beverage and then suspended the proceedings; and the court previously

dismissed business tort claims Plaintiff brought against Defendants.[21] Based on this, Defendants

contend Plaintiff violated ch. 93A and, in lieu of money damages, seek a public apology.

Plaintiff's conduct was not unfair or deceptive, especially in the context of ch. 93A, § 11,

which is "judged by a standard of unfairness higher than the standard employed where actions are

brought by a consumer under § 9 of the statute." *Madan v. Royal Indem. Co.*, 26 Mass. App. Ct. 756,

763 n.7 (1989). "To be actionable, the challenged misconduct must rise to the level of an 'extreme or

egregious' business wrong, 'commercial extortion,' or similar level of 'rascality' that raises 'an

eyebrow of someone inured to the rough and tumble of the world of commerce.'" *Peabody Essex*

*Museum, Inc. v. U.S. Fire Ins. Co.*, 802 F.3d 39, 54 (1st Cir. 2015) (quoting *Baker v. Goldman Sachs &*

*Co.*, 771 F.3d 37, 49-51 (1st Cir. 2014); *Zabin v. Picciotto*, 73 Mass. App. Ct. 141, 169 (2008)).

Defendants essentially argue that Plaintiff violated ch. 93A by initiating and prosecuting this lawsuit

because it knew there were problems with the validity of its mark due the herbalist community's use

of fire cider and the PTO's initial rejection and subsequent suspension of Plaintiff's second

application. But Plaintiff was entitled to test the validity of its registered mark, and initiating a lawsuit

to do so is not unfair or deceptive. *See, e.g., Quaker State Oil Refining Corp. v. Garrity Oil Co.*, 884 F.2d

15150, 1514 (1st Cir. 1989) (regardless of whether claims were ultimately unsuccessful, party had

"right to test them through litigation"). Moreover, the PTO's initial rejection of Plaintiff's second

trademark application was a non-final office action that invited Plaintiff to submit evidence and

arguments supporting its application. And the PTO's subsequent suspension of the application is

not an adjudication on the application's merits; it is merely a stay pending the resolution of this

---

[21] The court previously dismissed five of Plaintiff's claims under Massachusetts' anti-SLAPP statute: trade disparagement in violation of the Lanham Act (Count IV), unfair trade practices in violation of Mass. Gen. Laws ch. 93A, § 11 (Count VII), tortious interference with contractual relations (Count VIII), tortious interference with prospective business relations (Count IX), and trade libel (Count X). (Dkt. No. 83.) *Shire City Herbals, Inc. v. Blue*, No. 15-30069-MGM, 2016 WL 2757366 (D. Mass. May 12, 2016).

litigation. *See* 37 C.F.R. § 2.67. Accordingly, Defendants do not prevail on their ch. 93A

counterclaim, and Plaintiff is entitled to judgment on Counterclaim Count 2.

## IV.    CONCLUSION

For the foregoing reasons, the court orders as follows:

(1)    Judgment shall enter for Defendants on Counts 1, 2, 3, 5, and 6 and on Counterclaim Count 1.[22]

(2)    Judgment shall enter for Plaintiff on Counterclaim Count 2.

It is So Ordered.

/s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge

---

[22] Only in the prayers for relief in Defendants' answers and counterclaims did they request the court order cancelation of Plaintiff's registration of the Fire Cider mark. (Dkt. Nos. 212-214 at 12.) Defendants did not actually assert any counterclaim for cancelation of the registration, nor did they raise the issue at trial. *See* 15 U.S.C. § 1119 ("In any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action."); *Nasalok Coating Corp. v. Nylok Corp.*, 522 F.3d 1320, 1325 (Fed. Cir. 2008) (§ 1119 "allows a trademark infringement defendant to assert a counterclaim to cancel the registration"); 5 McCarthy on Trademarks & Unfair Competition § 30:109 ("[A] defendant charged with infringement of a registered mark may counterclaim for cancellation of that registration."). Because Defendants have not sufficiently raised the issue of canceling the registration, the court does not address it. *See* 5 McCarthy on Trademarks & Unfair Competition § 30:109 ("If a party fails to include a counterclaim for cancellation and prevails on the underlying trademark issues, the trial court has the discretion to either amend the judgment to include cancellation or to refuse to do so, leaving the USPTO to deal with the res judicata impact of the case in a cancellation proceeding.").